FILED
10/16/2024 12:35 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH09499
Calendar, 4
29800992

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

MARKEL AMERICAN INSURANCE
COMPANY,

            Plaintiff,

   vs.

SANFORD SCHMIDT; SCHMIDT ADVISORY
SERVICES, INC., d/b/a CATALYST WEALTH
MANAGEMENT, an Illinois corporation;
SCHMIDT FINANCIAL GROUP, LLC, an
Illinois limited liability company;
CHRISTOPHER LORENZEN; CBL
INVESTMENTS, LLC; DIANE FOWLER; and
JAMES P. MURAFF,

            Defendants.

Case No.: **2024CH09499**

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES the Plaintiff, Markel American Insurance Company ("MAIC"), by and through its attorneys, and for its Complaint for Declaratory Judgment against the Defendants Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management ("Catalyst Wealth"), Schmidt Financial Group, LLC ("Schmidt Financial") (collectively, with Sanford Schmidt and Schmidt Financial, the "Schmidt Defendants") and Christopher Lorenzen, CBL Investments, LLC ("CBL"), Diane Fowler and James P. Muraff (collectively the "Investor Defendants") (collectively with the Schmidt Defendants, the "Defendants"), and states as follows:

## I.   INTRODUCTION

1.     This is a declaratory judgment action brought pursuant to the Illinois Declaratory Judgment Act, 735 ILCS § 5/2-701, for the purpose of determining a real and justiciable controversy between MAIC and the Schmidt Defendants with respect to certain rights and obligations under Investment Advisor, Professional Services, and Directors and Officers Liability

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

Policy No. PL86085C, that MAIC issued to Catalyst Wealth for the period January 30, 2023 to January 30, 2024 (the "Policy").[1]

2.      MAIC seeks a declaration that it owes no obligation to defend or indemnify the Schmidt Defendants in connection with the following four matters:

a.  A December 7, 2023 letter from counsel for Christopher Lorenzen demanding that Sanford A. Schmidt and/or Schmidt Financial return to Lorenzen his $375,000 investment in the *Young Bear Grylls* animated feature trilogy (the "Lorenzen Demand");[2]

b.  *CBL Investments, LLC v. Sanford Schmidt, Schmidt Advisory Services, Inc., d/b/a Catalyst Wealth Management, and Schmidt Financial Group, LLC,* Case No. 2024L001179, filed on February 1, 2024 in the Circuit Court of Cook County, Illinois, (the "*CBL* Lawsuit");[3]

c.  *Diane Fowler, et al. v. Schmidt Advisory Services, Inc. d/b/a Catalyst Wealth Management, Sanford Schmidt, Ethan Schmidt, Jordan Schmidt, and Jason Cloth,* Case No. 2024CH01610 filed on March 5, 2024 in the Circuit Court of Cook County, Illinois, (the "*Fowler* Lawsuit");[4] and

d.  A January 22, 2024 email from James P. Muraff to Sanford Schmidt requesting a tolling agreement from Catalyst and seeking information pertaining to Schmidt Advisory's insurance policy (the "Muraff Matter")[5]

(collectively, the "Underlying Claim").

3.      As alleged more completely below, MAIC owes no obligation to defend or indemnify the Schmidt Defendants in connection with the Underlying Claim under the Policy.

## II.   PARTIES

4.      MAIC is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its office and principal place of business located in Glen Allen, Virginia.

---

[1] A true and correct copy of the Policy is attached hereto as **Exhibit A**.

[2] A true and correct copy of the Lorenzen Demand is attached hereto as **Exhibit B**.

[3] A true and correct copy of the complaint in the *CBL* Lawsuit is attached hereto as **Exhibit C**.

[4] A true and correct copy of the complaint in the *Fowler* Lawsuit is attached hereto as **Exhibit D**.

[5] A true and correct copy of the Muraff Matter is attached hereto as **Exhibit E**.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

5.      Upon information and belief, Sanford Schmidt is an individual domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

6.      Catalyst Wealth is an Illinois corporation with its principal place of business in Northbrook, Illinois.

7.      Schmidt Financial Group, LLC is an Illinois limited liability company with its principal place of business in Northbrook, Illinois.

8.      Upon information and belief, Sanford Schmidt is the sole managing member of Schmidt Financial Group, LLC, and Sanford Schmidt is domiciled in Cook County, Illinois and is a citizen of the State of Illinois.

9.      Upon information and belief, Christopher Lorenzen is an individual domiciled in Miami Beach, Florida and is a citizen of Florida.  As the claimant in the Lorenzen Demand, Mr. Lorenzen has an interest in the outcome of this insurance coverage action.  MAIC seeks no affirmative relief from Mr. Lorenzen other than to bind him to the outcome of this action.

10.      Upon information and belief, CBL is a Delaware limited liability company with its principal place of business in Miami Beach, Florida.  As the plaintiff in the *CBL* Lawsuit, CBL has an interest in the outcome of this insurance coverage action.  MAIC seeks no affirmative relief from CBL other than to bind it to the outcome of this action.

11.      Upon information and belief, Diane Fowler is an individual domiciled in Oklahoma and is a citizen of the State of Oklahoma.  As the plaintiff in the *Fowler* Lawsuit, Ms. Fowler has an interest in the outcome of this insurance coverage action.  MAIC seeks no affirmative relief from Ms. Fowler other than to bind her to the outcome of this action.

12.      Upon information and belief, James P. Muraff is an individual domiciled in Cook County, Illinois and is a citizen of Illinois.  As the claimant in the Muraff Matter, Mr. Muraff has

an interest in the outcome of this insurance coverage action. MAIC seeks no affirmative relief from Mr. Lorenzen other than to bind him to the outcome of this action.

III.    **JURISDICTION AND VENUE**

13.    This action is brought pursuant to the Illinois Declaratory Judgment Act, 735 ILCS § 5/2-701.

14.    Venue is appropriate in Cook County, Illinois because: (1) Defendant Catalyst Wealth, the Named Insured of the Policy, has its principal place of business in Cook County; (2) the *CBL Lawsuit* and the *Fowler* Lawsuit are both pending in the Circuit Court of Cook County; and (3) and a substantial part of the events giving rise to the Underlying Claim occurred in Cook County.

IV.    **FACTS COMMON TO ALL COUNTS**

   A.    **The Catalyst Wealth Management Media Fund I, LLC**

15.    Catalyst Wealth provides investment advice and management to various clients, including individual investors and pension plans.

16.    Schmidt Financial is an Illinois LLC that advertises itself as a "boutique financial planning firm," serving the high-net-worth marketplace.

17.    Sanford Schmidt is the both the president of Catalyst Wealth and a member of Schmidt Financial.

18.    One of the investment funds that Sanford Schmidt/Catalyst Wealth manages is the Catalyst Wealth Management Media Fund I, LLC. Catalyst Wealth serves as Catalyst Wealth Management Media Fund I, LLC's sole manager.

19.    Catalyst Wealth Management Media Fund I, LLC's strategic partners are a film and television financing company called Creative Wealth Media Finance Corp. ("CWMF") and a film

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

4

and television production company BRON Studios ("BRON Studios"). CWMF is the primary financer for BRON Studios.

20. Jason Cloth is the founder of CWMF and a co-founder of BRON Studios.

21. According to an investment brochure or "pitch deck" that Catalyst Wealth provided to investors ("Pitch Deck I"), Catalyst Wealth Management Media Fund I, LLC was co-managed by CWMF. (*See* Ex. D at Exhibit B.)

22. The Pitch Deck I described the investment objective and strategy for the fund as follows:

> ► Investment Objective - Catalyst Wealth is sponsoring a closed ended investment fund for a limited number of qualified investors. The objective of the fund is to generate a high level of current returns and appreciation from loans for studio and independently produced motion pictures, television, and animated production.
>
> ► Investment strategy - providing investors with attractive short / medium term project lending at high yields. The objective of the fund is to generate high current income with additional strong ancillary returns on digital animated content being exclusively produced for the global streaming market.

(*See* Ex. D at Exhibit B.)

23. Pitch Deck I indicated that the funds invested in the Catalyst Wealth Management Media Fund I, LLC would be used in the production and/or distribution of four animated features *Fables*, *Gossamer*, *Bubbles Hotel*, and *Hailey and the Hero Heart*. (*See* Ex. D at Exhibit B.)

24. On May 4, 2020, pursuant to a loan and security agreement, CWMF agreed to loan to an entity called YBG Commercial Ltd. ("YBG Commercial") approximately $11 million to fund the production of the *Young Bear Grylls* animated movie trilogy (the "YBG Trilogy"), which would be distributed by BRON Studios.

25. In July of 2020, Sanford Schmidt prepared a confidential private placement memorandum ("PPM") concerning the offering for sale of interests in the Catalyst Wealth

FILED DATE: 10/16/2024 12:35 PM  2024CH09499

Management Media Fund I, LLC and began recruiting investors through Catalyst Wealth and Schmidt Financial.

26.     In support of this recruitment effort, Catalyst Wealth modified the pitch deck for Catalyst Wealth Management Media Fund I, LLC to showcase the YBG Trilogy as one of the fund's featured projects ("Pitch Deck II"). (*See* Ex. C, ¶18.)

27.     The Catalyst Wealth clients who invested in CWMF, paid CWMF a five percent (5%) facilitation fee, which CWMF in turn, passed along to Catalyst Wealth and/or Schmidt Financial.

28.     Catalyst Wealth and Sanford Schmidt also received compensation from Catalyst Media Fund.  As the fund manager, Sanford Schmidt would receive two percent (2%) of the assets deducted from the fund's return.

**B.     The Lorenzen/CBL Investment**

29.     In the summer of 2020, Sanford Schmidt approached CBL's sole managing member, Christopher Lorenzen ("Lorenzen"), with an opportunity for CBL to become an investor in the YBL Trilogy. (*See* Ex. C, ¶20.)

30.     Sanford Schmidt presented Lorenzen with Pitch Deck II, the PPM, a Catalyst Wealth Management Media Fund I, LLC Subscription Agreement, term sheet and an Investment Advisory agreement with Catalyst Wealth. (*See* Ex. C, ¶20.)

31.     Both Pitch Deck II and the PPM detailed a six-step vetting process for all features that the Catalyst Wealth Management Media Fund I, LLC would finance. (*See* Ex. C, ¶21.)

32.     Sanford Schmidt urged CBL to invest $1 million in the Catalyst Wealth Management Media Fund I, LLC and $1 million toward production of the YBG Trilogy, claiming that the profit estimates showed double returns, and that both investments should provide "capital

out" within 12 months, plus merchandising and licensing revenue for years to come. (*See* Ex. C, ¶22.)

33.     Sanford Schmidt claimed that he had to convince CWMF to open up another $1 million to make room for CBL to invest in the YBG Trilogy. (*See* Ex. C, ¶23.)

34.     On August 17, 2020, Lorenzen – on behalf of CBL – entered into a Catalyst Wealth Management Media Fund I, LLC Subscription Agreement with Catalyst Wealth Management Media Fund I, LLC, pursuant to which it agreed to lend CWMF $750,000 through a participation note. (*See* Ex. C, ¶24.)

35.     On information and belief, the Catalyst Wealth Management Media Fund I, LLC Subscription Agreement executed by CBL contained the following provision:

> **Certain Fees.** In addition to other fees payable by the Fund, Subscriber hereby acknowledges and agrees to pay an annualized management fee (the "Management Fee") of 2.0%, or 0.50% quarterly of Subscriber's funded capital in the Fund. Subscriber also acknowledges that the Manager, after the Members have received a return of their capital contributions and a Preferred Return the Manager will be entitled to a catchup distribution in an amount equal to 20% of the Preferred Return made to the Members and thereafter 20% of any distributions made by the Fund.

36.     On August 14, 2020, CBL entered into an Investment Advisory Agreement with Catalyst Wealth, specifically referencing the "Young Bear Grylis Series".[6]

37.     CBL's Investment Advisory Agreement with Catalyst Wealth contained the following provision:

> As compensation for our Discretionary Services, you agree to pay in arrears, a fee charged to the Account(s) on the first day of each monthly or quarterly period (as indicated on Exhibit A) which is based on the market value of the assets in the Account(s) on the last day of the immediately preceding period, at the rate provided in Exhibit A. As compensation for any PAI services, you agree to pay a fee charged to the Account(s) as indicated on Exhibit A. The fees paid by Client cover only Catalyst Wealth's advisory services and Client will also pay all expenses and fees associated with the Account(s), including all fees charged by Investments (such as

---

[6] A true and correct copy of CBL's Investment Advisory Agreement with Catalyst Wealth is attached hereto as **Exhibit F**.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

12(b)-1 fees, mutual fund sales loads and surrender charges), PAIs and the Custodian's fees, in addition to any specific execution charges that may be imposed as described in our Brochure. To the extent our engagement of any TPM may increase our fees for Discretionary Services, we will notify you in advance.

(Ex. F at 3.)

38.　According to the term sheet included with the Catalyst Wealth Management Media Fund I, LLC Subscription Agreement, proceeds of the loan would be "used exclusively to finance the pre-production, production, post-production and delivery of the [YBG Trilogy] Project." (*See* Ex. C, ¶24.)

39.　On December 30, 2020, only a few months after CBL entered into the Catalyst Wealth Management Media Fund I, LLC Subscription Agreement, Sanford Schmidt claimed to CBL that the "three Bear Grylls animated movies are well into production with 2 out of 3 complete," and that a bidding was imminent. (*See* Ex. C, ¶30.)

40.　On June 9, 2021, Sanford Schmidt again emailed CBL advising it that production was "underway" and that there were ongoing "sales discussions" regarding distribution rights. (*See* Ex. C, ¶32.)

**C.　The Purported *Fowler* Class Members' Investments**

41.　According to the complaint filed in the *Fowler* Lawsuit, numerous other investors (the "Purported *Fowler* Class Members") were recruited by the Schmidt Defendants to provide funds for the production and distribution of YBG Trilogy. (*See* Ex. D, ¶¶94-95.)

42.　As with Lorenzen/CBL, these investors were told that they would receive their "capital out" in 12 months, that each film project was carefully vetted, and the investment would be used to "exclusively" fund the YBG Trilogy. (*See* Ex. D, ¶94.)

43.　Based upon these representations, the Purported Fowler Class Members entered into a Catalyst Wealth Management Media Fund I, LLC Subscription Agreement with the Catalyst Media Fund. (*See* Ex. D, ¶95.)

8

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

44.    On information and belief, the Catalyst Wealth Management Media Fund I, LLC Subscription Agreements executed by the Purported *Fowler* Class Members contained the following provision:

> **Certain Fees.** In addition to other fees payable by the Fund, Subscriber hereby acknowledges and agrees to pay an annualized management fee (the "Management Fee") of 2.0%, or 0.50% quarterly of Subscriber's funded capital in the Fund. Subscriber also acknowledges that the Manager, after the Members have received a return of their capital contributions and a Preferred Return the Manager will be entitled to a catchup distribution in an amount equal to 20% of the Preferred Return made to the Members and thereafter 20% of any distributions made by the Fund.

45.    On information and belief, each of the Purported *Fowler* Class Members executed an Investment Advisory Agreement with Catalyst Wealth that contained the following provision:

> As compensation for our Discretionary Services, you agree to pay in arrears, a fee charged to the Account(s) on the first day of each monthly or quarterly period (as indicated on Exhibit A) which is based on the market value of the assets in the Account(s) on the last day of the immediately preceding period, at the rate provided in Exhibit A. As compensation for any PAI services, you agree to pay a fee charged to the Account(s) as indicated on Exhibit A. The fees paid by Client cover only Catalyst Wealth's advisory services and Client will also pay all expenses and fees associated with the Account(s), including all fees charged by Investments (such as 12(b)-1 fees, mutual fund sales loads and surrender charges), PAIs and the Custodian's fees, in addition to any specific execution charges that may be imposed as described in our Brochure. To the extent our engagement of any TPM may increase our fees for Discretionary Services, we will notify you in advance.

**D.    The Muraff Investment**

46.    In June 2021, James P. Muraff entered into a Catalyst Wealth Management Media Fund I, LLC Subscription Agreement,[7] which included the following provision:

> **Certain Fees.** In addition to other fees payable by the Fund, Subscriber hereby acknowledges and agrees to pay an annualized management fee (the "Management Fee") of 2.0%, or 0.50% quarterly of Subscriber's funded capital in the Fund. Subscriber also acknowledges that the Manager, after the Members have received a return of their capital contributions and a Preferred Return the Manager will be entitled to a catchup distribution in an amount equal to 20% of the Preferred Return made to the Members and thereafter 20% of any distributions made by the Fund.

---

[7] A true and correct copy of Muraff's Catalyst Media Fund Subscription Agreement is attached hereto as **Exhibit G**.

47.     Pursuant to the Catalyst Wealth Management Media Fund I, LLC Subscription Agreement, Muraff agreed to lend CWMF $450,000 through a participation note.

48.     On information and belief, Muraff executed an Investment Advisory Agreement with Catalyst Wealth that contained the following provision:

> As compensation for our Discretionary Services, you agree to pay in arrears, a fee charged to the Account(s) on the first day of each monthly or quarterly period (as indicated on Exhibit A) which is based on the market value of the assets in the Account(s) on the last day of the immediately preceding period, at the rate provided in Exhibit A. As compensation for any PAI services, you agree to pay a fee charged to the Account(s) as indicated on Exhibit A. The fees paid by Client cover only Catalyst Wealth's advisory services and Client will also pay all expenses and fees associated with the Account(s), including all fees charged by Investments (such as 12(b)-1 fees, mutual fund sales loads and surrender charges), PAIs and the Custodian's fees, in addition to any specific execution charges that may be imposed as described in our Brochure. To the extent our engagement of any TPM may increase our fees for Discretionary Services, we will notify you in advance.

**E.     The Fowler Investment**

49.     In January 2023, Diane Fowler invested $1 million with CWMF as part of the funds raised by the Schmidt Defendants through the Catalyst Wealth Management Media Fund I, LLC. (*See* Ex. D, ¶¶171-73.)

50.     On information and belief, Diane Fowler in connection withs her investment with CWMF, entered into a Catalyst Wealth Management Media Fund I, LLC Subscription Agreement that included the following provision:

> **Certain Fees.** In addition to other fees payable by the Fund, Subscriber hereby acknowledges and agrees to pay an annualized management fee (the "Management Fee") of 2.0%, or 0.50% quarterly of Subscriber's funded capital in the Fund. Subscriber also acknowledges that the Manager, after the Members have received a return of their capital contributions and a Preferred Return the Manager will be entitled to a catchup distribution in an amount equal to 20% of the Preferred Return made to the Members and thereafter 20% of any distributions made by the Fund.

51.     Pursuant to the Catalyst Wealth Management Media Fund I, LLC Subscription Agreement, Fowler agreed to lend CWMF $1,000,000 through a participation note.

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

52. On information and belief, Diane Fowler, in connection withs her investment with CWMF, executed an Investment Advisory Agreement with Catalyst Wealth that contained the following provision:

> As compensation for our Discretionary Services, you agree to pay in arrears, a fee charged to the Account(s) on the first day of each monthly or quarterly period (as indicated on Exhibit A) which is based on the market value of the assets in the Account(s) on the last day of the immediately preceding period, at the rate provided in Exhibit A. As compensation for any PAI services, you agree to pay a fee charged to the Account(s) as indicated on Exhibit A. The fees paid by Client cover only Catalyst Wealth's advisory services and Client will also pay all expenses and fees associated with the Account(s), including all fees charged by Investments (such as 12(b)-1 fees, mutual fund sales loads and surrender charges), PAIs and the Custodian's fees, in addition to any specific execution charges that may be imposed as described in our Brochure. To the extent our engagement of any TPM may increase our fees for Discretionary Services, we will notify you in advance.

**F.     The CWMF Ponzi Scheme Collapses and CWMF Files for Bankruptcy**

53. In mid-2022, Sanford Schmidt came to believe that CWMF was not being transparent with its investors.

54. Around this time, Sanford Schmidt discovered that CWMF had defaulted on various loans when it failed to pay back the portion of the principal that was due; CWMF made only interest payments.

55. On March 19, 2021, CWMF was sued in federal court in an action alleging that it had defaulted on a $2.5 million dollar loan, in an action styled as *Preserver, LP v. Creative Wealth Media Fin. Corp.,* No. 1:21-cv-02456 (S.D.N.Y. filed Mar. 19, 2021).

56. On October 6, 2021, another action was filed against CWMF alleging that CWMF and BRON Studios had defaulted on loans totaling approximately $14 million, *Hudson Private LP v. BRON Studios USA, Inc. , et al.,* No. 7:21-cv-08259 (S.D.N.Y. filed Oct. 6, 2021) (the "*Hudson Partners* Lawsuit").

57. CWMF told Sanford Schmidt that it would cure the defaults on the loans from the Schmidt investors through the sale of BRON Studios.

11

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

58.     By the end of 2022, Sanford Schmidt became concerned that CWMF was possibly operating as a Ponzi scheme – *i.e.,* paying off old investors with the proceeds received from new investors.

59.     By this time two additional lawsuits had been brought against CWMF for defaulting on its loan obligations; one suit specifically accused CWMF of perpetrating a Ponzi scheme  (see *Bayshore Capital Advisors, LLC v. Creative Wealth Media Fin. Corp, et al,* No. 7:22-cv-01105 (S.D.N.Y. filed Feb. 2, 2022) the other accused CWMF and Jason Cloth of fraud in connection with the financing for the YBG Trilogy (see *Robert Scot Building Venture, LLC. v. Creative Wealth Media Finance Corp, et al.* (S.D.N.Y. filed Dec. 7, 2022).

60.     Nonetheless, on February 15, 2023, Sanford Schmidt emailed investors, with an update on the YBG Trilogy and financial projections from BRON.  In the email, Schmidt assured investors "[w]e expect YBG to be monetized this year" and advised that the first film in the trilogy was completed and that the second film was in the "Post" and that both films would be shopped to global buyers later in the month.

61.     On July 10, 2023, Jason Cloth and Sanford Schmidt appeared together in a Zoom meeting with investors in which Cloth advised that although BRON Studios had filed for bankruptcy, he had secured back-up financing to repay the BRON Studios investors so there was "100% likelihood that he would repay the investors in CWMF within 110 days."

62.     On September 27, 2023, Sanford Schmidt participated in a conference call with investors in which he admitted that he knew for a year prior that the YBG Trilogy was vastly underfunded and mismanaged, that investor funds had been misappropriated, and that a BRON Studio executive had personally communicated this issue to him. (*See* Ex. C, ¶47.)

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

63.     During the call, Sanford Schmidt further admitted that he had consulted months earlier with several various law firms that had filed suits against CWMF for similar investment schemes. (*See* Ex. C, ¶47.)

64.     On November 28, 2023, CWMF filed a petition for voluntary bankruptcy in Ontario, Canada.

**G.      Catalyst Wealth Provides MAIC With Notice of a Potential Claim**

65.     By e-mail dated November 13, 2023, Schmidt Advisory provided MAIC with notice of CWMF's intention to file for bankruptcy in the District of Ontario, Toronto Division.

66.     MAIC accepted the November 13, 2023 e-mail as a notice of circumstances pursuant to Section VI – Notice B. of the Policy (the "Notice Provision"), which provides:

> If, during the **Policy Period**, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

**H.      The Underlying Claim**

  1.    The Lorenzen Demand

67.     On December 7, 2023, Catalyst Wealth received the Lorenzen Demand (Ex. B.) – a letter from counsel for Christopher Lorenzen demanding that Sanford Schmidt and Catalyst Wealth "return to Lorenzen his $750,000 investment" in the YBG Trilogy and accusing Sanford Schmidt and Catalyst Wealth of fraud.

68.     On January 18, 2024, Lorenzen's counsel followed up his prior correspondence with a demand that Sanford Schmidt, Schmidt Financial, and Catalyst Wealth enter into a tolling

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

agreement with Christopher Lorenzen and CBL with respect to any claims that Lorenzen/CBL have in connection with the investment in the YBG Trilogy project.[8]

2. *CBL* Lawsuit

57.    On February 1, 2024, CBL filed the *CBL* Lawsuit against Sanford Schmidt, Schmidt Advisory, and Schmidt Financial. (*See* Ex. C.)

58.    The *CBL* Lawsuit alleges that Sanford Schmidt, personally and through his advisory and financial services companies, Catalyst Wealth and Schmidt Financial, deceived and defrauded investor CBL. (*See* Ex. C, ¶1.)

59.    The *CBL* Lawsuit alleges that CBL agreed to invest money to finance the YBG Trilogy based upon false representations made by Sanford Schmidt that the timeline for the investment would be short, that the films had been carefully vetted and that CBL's investment would be used solely to fund the YBG Trilogy. (*See* Ex. C, ¶2.)

60.    The *CBL Lawsuit* alleges that after securing CBL's investment, Sanford Schmidt repeatedly made misrepresentations to CBL about the status of the films, the prospects for distribution, and the timeline for investors' exit. It is alleged that given Sanford Schmidt's close relationship to and involvement with the Catalyst Media Fund's strategic partners CWMF and Bron, Sanford Schmidt knew, or reasonably should have known, these statements were false. (*See* Ex. C, ¶29.)

61.    The *CBL Lawsuit* alleges that Sanford Schmidt knew, or reasonably should have known of the various lawsuits that had been brought against CWMF arising out of CWMF's default on various loans, but Sanford Schmidt failed to timely disclose this information to investors. (*See* Ex. C, ¶ 33.)

---

[8] A true and correct copy of Lorenzen's counsel's January 18, 2024 email and draft tolling agreement are attached hereto as **Group Exhibit G**.

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

62.     The *CBL* Lawsuit alleges that YBG Trilogy was never fully funded, as CWMF only provided $7,550,000 to YBG Commercial, leaving a shortfall of approximately $3 million.  The *CBL* Lawsuit alleges that in or around July of 2023, Sanford Schmidt was unable to account for the $3,000,000 shortfall so he and another individual, Jeff Krol, set up a "Completion Fund" to raise additional funds to complete production of the YBG Trilogy. (*See* Ex. C, ¶41-42.)

63.     The *CBL Lawsuit* alleges that on August 4, 2023, without notice to CBL or any of the original investors, CWMF modified its original loan agreement with YBG Commercial "to enable the Completion Funds…to be recouped by those providing the Completion Funds ahead of Lender [CWMF] recouping sums due to it pursuant to the [Loan and Security Agreement]." The *CBL Lawsuit* alleges that upon information and belief, Sanford Schmidt, Schmidt Financial, and Schmidt Advisory were closely involved in the modification of the original loan agreement to facilitate the Completion Fund and put Completion Fund investors in a first position. (*See* Ex. C, ¶43.)

64.     The *CBL Lawsuit* asserts six counts against Sanford Schmidt, Catalyst Wealth and Schmidt Financial: (1) Violation of the Illinois Securities Law of 1953 815 ILCS 5/12(f), (g), and (j); (2) Violation of the Illinois Consumer and Fraud Deceptive Business Practices Act 815 ILCS 505/2; (3) Fraudulent Misrepresentation; (4) Negligent Misrepresentation; (5) Breach of Fiduciary Duty; and (6) Unjust Enrichment. (*See* Ex. C.)

69.     CBL's prayer for relief requests that the court declare the sale of the security void and award CBL the amount CBL paid plus interest, compensatory and punitive damage, and attorneys' fees and costs. (*See* Ex. C, p. 17-18.)

3.     *Fowler* Lawsuit

65.    On March 5, 2024, Diane Fowler filed a purported Class Action Complaint (the *Fowler* Lawsuit) against Catalyst Wealth, Sanford Schmidt, Jordan Schmidt, and Jason Cloth. (*See* Ex. D).  Jordan Schmidt was subsequently voluntarily dismissed from the action.

66.    According to the *Fowler* Lawsuit, upon information and belief, Schmidt received a carried interest in the investments he placed with CWMF. ( *See* Ex. D, ¶36.)

67.    According to the Fowler Lawsuit, Diane Fowler reasonably relied on Sanford Schmit's due diligence of the investment and the representations that they were investing in specific projects, rather than "Cloth's personal piggy bank." (*See* Ex. D, ¶131.)

68.    Diane Fowler further alleged that "[r]ather than relying on any substantive investigation of its own, [the Schmidt Defendants] relied on the fact that Cloth [*i.e.*, CWMF] kept paying as sufficient evidence that the apparent Ponzi Scheme was legitimate." (*See* Ex. D, ¶131.)

69.    The Fowler Lawsuit alleges that Sanford Schmidt violated FINRA rules by failing to perform reasonable due diligence on a private placement prior to offering it for sale to its customers, in violation of FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1). (*See* Ex. D, ¶ 144.)

70.    The Fowler Lawsuit alleges that Sanford Schmidt had a duty to conduct a reasonable investigation in connection with each offering and failed to conduct the proper due diligence, which caused his conduct to fall below the standard of care and thereby breaching his duties owed to Fowler and the potential Class. (*See* Ex. D, ¶147-155; 164.)

71.    The *Fowler* Lawsuit brings a sub-class of potential plaintiffs for "[a]ll persons who invested in the "Cloth Offering" with [the Schmidt Defendants] from January 1, 2020 to December 31, 2020." (*See* Ex. C, ¶177.)

72.    The *Fowler* Lawsuit defines the term "Cloth Offering" as:

<div style="text-align: left; writing-mode: vertical-rl;">FILED DATE: 10/16/2024 12:35 PM   2024CH09499</div>

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

> promissory notes and co-investment agreements used to fund individual projects offered by Cloth and promissory notes to fund CMWF including Series B and Series E notes and later in [the Schmidt Defendants'] own fund, Catalyst Wealth [Management Media Fund I, LLC] that aggregated investment for CMWF.

(*See* Ex. D, ¶118.)

70.     The *Fowler* Lawsuit asserts the following causes of action against one or all of the Schmidt Defendants: (1) violation of the Illinois Securities Law ("ISL") of 1953, 815 ILCS 5/12(g) against Schmidt; (2) negligent representation against the Schmidt Defendants; and (3) unjust enrichment against the Schmidt Defendants. (*See* Ex. D.)

### 4.    Muraff Matter

57.     On January 22, 2024, James P. Muraff sent an email to Sanford Schmidt requesting a draft tolling agreement and information about Catalyst Wealth's insurance policy so that he could "consider filing a claim."  (*See* Ex. E.)

58.     On or about January 31, 2023, counsel for James P. Muraff advised MAIC that the Schmidt Defendants convinced Mr. Muraff to invest $450,000 in the Catalyst Wealth Management Media Fund I, LLC for the production of creative works which were to be produced by BRON Studios and that Mr. Muraff sustained damages as a result.

**I.      The Relevant Policy Provisions**

59.     MAIC issued the Policy to Catalyst Wealth for the policy period effective January 30, 2023 to January 30, 2024. (*See* Ex. A).

60.     The Policy contains an Exclusion - Specified Person, Organization, Investment Vehicle, Service or Activity Endorsement that provides, in pertinent part:

> This Policy provides no coverage for any **loss**[9] in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or

___
[9] Terms appearing in **bold** are defined by the Policy.

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

61.     The Schedule to the Endorsement lists the Catalyst Wealth Management Fund I, LLC Fund as the "specified organization" for purposes of the exclusion.

62.     Subject to all terms, conditions, limitations, exclusions and endorsements, including but not limited to, the Exclusion - Specified Person, Organization, Investment Vehicle, Service or Activity Endorsement referenced above, the Policy provides Investment Adviser Professional Liability Insurance coverage and Professional Liability Insurance coverage only with a $2,000,000 each **loss** limit of liability and a $2,000,000 aggregate limit of liability, subject to a $100,000 each **loss** retention.[10]

63.     **Defense costs** and **loss** reduce both the limit of liability and retention.

64.     Coverage under the Policy is subject to a December 31, 2020 "Prior Knowledge Date."

65.     The Insuring Agreements in SECTION I – COVERAGE provide, in relevant part, that the Insurer, relying on the statements in the **application**, agrees with the Named Entity as follows:

---

[10] The Policy was issued on January 30, 2023 with a $1,000,000 each **loss** limit of liability and a $1,000,000 aggregate limit of liability.  On or about June 23, 2023, the Policy limits were retroactively increased to $2,000,000 each **loss** and $2,000,000 in the aggregate based upon Catalyst Wealth's representation that:

> After reasonable inquiry the undersigned representative of the Insured [Sanford Schmidt] warrants that there are no claims or losses or any facts, circumstances, situations, incidents, conditions, defects or suspended defects which might afford grounds for any claim and for which coverage may be afforded by the policy referenced above and any proposed endorsement, other that that which has already been disclosed or reported to the insurer or its underwriting manager….

(Ex. A at Policyholder's Supplemental Application for Increased Limits.)

FILED DATE: 10/16/2024 12:35 PM  2024CH09499

Coverage is provided under the following Insuring Agreement(s) only if a Limit of Liability for such Insuring Agreement(s) is shown in the Declarations.

**1. Investment Adviser Professional Liability Insurance**

The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

**2. Professional Liability Insurance**

The Insurer will pay, on behalf of an **accounting firm**, **life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

66.     SECTION II – DEFINITIONS, B. of the Policy defines **broker** to have the "meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**."

67.     SECTION II – DEFINITIONS, E. of the Policy defines **claim**, in relevant part, to mean:

> 2.  A civil proceeding commenced by the service of a complaint or similar pleading;

> \*       \*       \*

> 7.  Any written request to toll or waive any statute of limitations commenced by the receipt of such request;

> \*       \*       \*

made upon an **insured** for a **wrongful act**.

68.     SECTION II – DEFINITIONS, F. of the Policy defines **dealer** as "the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but dealer does not mean a person who is a **registered representative.**"

69.     SECTION II – DEFINITIONS, G. of the Policy defines **defense cost(s)** to mean:

reasonable and necessary fees, costs, charges, and expenses incurred in the investigation, defense or appeal of any **claim** and the costs of

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

appeal, attachment or similar bonds (but does not include applying for or furnishing such bond).

**Defense costs** do not include fees, salaries, regular or overtime wages, overhead, benefits or extradition expenses.

70.     SECTION II – DEFINITIONS, P. of the Policy defines **insured(s)** to mean the "Named Entity, **insured entity(ies)** and the **insured person(s)**."

71.     SECTION II – DEFINITIONS, Q. of the Policy defines i**nsured adviser(s)** to mean "the Named Entity that is a registered 'investment adviser' as defined in the Investment Advisers Act of 1940, and its amendments, and which renders **investment advisory services** to others."

72.     SECTION II – DEFINITIONS, R. of the Policy defines **insured entity(ies)** to mean "the **accounting firm(s)**, **insured adviser**(s), **life and health insurance agency**(ies) or **professional service provider(s)**."

73.     SECTION II – DEFINITIONS, S. of the Policy defines **insured executive(s)** to mean "any person who has been, now is or becomes a duly elected or appointed partner, director, officer, chief compliance officer, managing member, manager or trustee of an **insured entity**."

74.     SECTION II – DEFINITIONS, T. of the Policy defines **insured person(s)**, in relevant part, to mean:

    1.  The **insured executives**;
    2.  The chief compliance officer;
    3.  Any person who has been, now is or will become an employee of an **insured entity**, but solely while providing **accounting services**, **investment advisory services**, **life and health services** or **professional services** on behalf of such **insured entity[.]**

75.     SECTION II – DEFINITIONS, W. of the Policy defines **life and health insurance agency** to mean "any entity specifically listed on the Schedule of Insurance Agencies endorsement to this Policy that renders **life and health services**, but only while such entity is acting on behalf of the Named Entity.

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

76.    SECTION II – DEFINITIONS, X. of the Policy defines **life and health services** to mean any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**.

77.    SECTION II – DEFINITIONS, Y. of the Policy defines **life insurance agent** to mean:

> an individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

78.    SECTION II – DEFINITIONS, Z. of the Policy, as amended by the Illinois Amendatory Endorsement, form MPL 1484-IL 05 19, defines **loss** to mean "the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages, judgments, settlements and **defense costs**."

> **Loss** does not include:
>
> 1. Payments for pre-judgment and post-judgment interest as described in Paragraph C. below in the amendment to Section IV – Limits of Liability and Retentions;
>
> \*       \*       \*
>
> 4. Any amount not insurable under the law pursuant to which this Policy is construed;
>
> \*       \*       \*
>
> 7. Punitive, exemplary or multiplied damages, except that if a suit is brought against the **insured** with respect to a claim for acts or alleged acts falling within coverage hereof, seeking both compensatory and punitive or exemplary damages, then the insurer will afford a defense to such action without liability for such punitive or exemplary damages.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

79.     SECTION II – DEFINITIONS, FF. of the Policy defines **professional service(s)** to mean "services rendered for or advice given to others by an **insured** for a fee, remuneration, **pro bono** or other consideration in an **insured's** business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy."

80.     SECTION II – DEFINITIONS, GG. of the Policy defines **professional service provider** to mean "any individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy that renders **professional services**, but only while such individual or entity is acting on behalf of the Named Entity."

81.     SECTION II – DEFINITIONS, HH. of the Policy defines **registered representative** to mean a person who:

1.  Is registered with the Financial Industry Regulatory Authority (FINRA) or its successor as a registered representative of a broker or dealer pursuant to the provisions of the Securities Exchange Act of 1934; and

2.  Is in the business of buying and selling securities for the account of others, including but not limited to, direct participation products such as limited partnerships, shares in mutual funds, unit investment trusts and variable annuities

    **Registered representative** does not include any person while acting in the capacity of a principal of a **broker** or **dealer**, including but not limited to a General Securities Principal or Limited Principal General Securities Sales Supervisor.

82.     SECTION II – DEFINITIONS, JJ. of the Policy defines s**ecurity** to mean the following:

1.  The Securities Exchange Act of 1934;

2.  The Securities Act of 1933;

3.  The Investment Advisers Act of 1940 as amended; or

4.  Any rules issued by the Securities Exchange Commission pursuant to any of these acts.

    **Securities** means the plural of **security** as defined herein.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

\*     \*     \*

83.     SECTION II – DEFINITIONS, PP. of the Policy defines **wrongful act** to mean the following:

1.  With respect to Insuring Agreement 1. Investment Adviser Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**;

2.  With respect to Insuring Agreement 2. Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any…

\*     \*     \*

   b.  **Life and health insurance agency** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **life and health services**; or

   c.  **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**…

\*     \*     \*

84.     SECTION III – EXCLUSIONS, J. provides, in relevant part, that the Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to any:

1.  Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

2.  Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**[.]

85.     SECTION III – EXCLUSIONS, R. provides, in relevant part, that the Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

Any **claim** involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an **insured** for **accounting services**, **investment advisory services**, **life and health services** or **professional services** rendered by an **insured**; provided, however, that this exclusion will not apply to **defense costs**.

86.     SECTION IV – LIMITS OF LIABILITY AND RETENTIONS, A. of the Policy

provides in relevant part:

    **A.   Limits Of Liability**

<div align="center">*     *     *</div>

       3.   **Interrelated Wrongful Acts**

All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section VI –Notice, whichever is earliest, whether before or during the Policy Period.

**Defense costs** are part of, not in addition to, the applicable Limit Of Liability. Such **defense costs** will reduce the applicable Limit Of Liability and will be applied against the Retention. The Insurer will have no obligation to pay any **loss** or to defend or continue to defend any **claim** or to pay **defense costs** after the applicable Limits Of Liability have been exhausted by payment of **loss** or **defense costs**.

    **B.   Retention**

       1.   The Insurer will pay only that portion of any **loss** which is in excess of the applicable Retention for each Insuring Agreement shown in the Declarations, up to the applicable Limit Of Liability shown in the Declarations. A Retention will apply to each and every **claim**, and such Retention will be borne by the **insureds** uninsured and at their own risk.

       2.   No Retention will apply to **loss** incurred by an **insured executive** if such **loss** cannot be indemnified by the Named Entity or **insured entity** because the Named Entity or **insured entity** is not permitted or required to indemnify, or is not financially able to indemnify by reason of **financial impairment**. The Insurer's liability for all other covered **loss** will apply only to that part of **loss** on account of each **claim**

<div align="center">24</div>

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

which is excess of the applicable Retention shown in the Declarations.

3. If different parts of a single **claim** are subject to different Retentions, the applicable Retention will be applied separately to each part of the **claim**. The sum of the Retentions will not exceed the largest applicable Retention.

\*  \*  \*

87.   The Life Product Sales Coverage – Named Individuals Endorsement (the "Life Product Sales Endorsement"), form MPL 1224 07 17, in the Policy provides, in relevant part:

### SCHEDULE

| Named Individuals | Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent | Pending And Prior Proceeding Date For Registered Investment Adviser Services | Termination Date |
|---|---|---|---|
| Sanford Schmidt | 03/01/1985 | 12/02/1993 | |
| Ethan Michael Schmidt | 08/30/2019 | 08/22/2019 | |

**J.**  Each of the Named Individuals shown in the Schedule of this endorsement is a covered **insured** and subject to the exclusion in Paragraph **B.** of this endorsement.

**K.**  Section III – Exclusions is amended by the following:

1.   The following exclusion is added:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

The purchase or sale of **securities** or investments as a **registered representative** or insurance products as a **life insurance agent**; however, this exclusion will not apply to the Named Individuals shown in the Schedule of this endorsement, solely with respect to **wrongful acts** in the rendering of or failure to render **professional services**…

\*  \*  \*

2.   As a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement;

\*      \*      \*

2.      With respect to coverage provided by this endorsement, exclusion J.2. does not apply.

\*      \*      \*

88.     The Specified Person, Organization, Investment Vehicle, Service or Activity Exclusion (the "Specified Organization Exclusion"), form MPL 1323 05 19, which states:

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following is added to Section III – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

89.     The Schedule for the Specified Organization Exclusion includes, in relevant part:

Based upon arising from or in consequence of the Catalyst Wealth Management Media Fund I, LLC TLG Advisors, Inc.

\*      \*      \*

**J.      Coverage Correspondence**

90.     By e-mail dated November 13, 2023, Schmidt Advisory provided MAIC with notice of CWMF's intention to file for bankruptcy in the District of Ontario, Toronto Division.

91.     MAIC accepted the November 13, 2023 e-mail as a notice of circumstances pursuant to Section VI – Notice B. of the Policy (the "Notice Provision"), which provides:

If, during the **Policy Period**, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

**claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

92.     By letter dated January 22, 2024, coverage counsel for Catalyst Wealth, Lynda Bennett of Lowenstein Sandler, provided notice of Christopher Lorenzen's and Diane Fowler's separate demands that Catalyst Wealth execute tolling agreements in connection with the Schmidt Defendants alleged wrongful acts in connection with their investments connected with CWMF.[11]

93.     On January 26, 2024, Ms. Bennett provided MAIC with notice of the Muraff Matter.[12]

94.     By e-mail dated February 2, 2024, Ms. Bennett provided notice of the *CBL* Lawsuit. (*See* Ex. I.)

95.     Shortly thereafter, Catalyst Wealth provided notice of the *Fowler* Lawsuit.

96.     By letter dated May 2, 2024, MAIC issued a letter to Catalyst Wealth denying coverage for the Underlying Claim (i.e., collectively the Lorenzen Demand, the *CBL* Lawsuit, the *Fowler* Lawsuit and the Muraff Matter) on the basis of various terms, conditions and exclusions contained in the Policy (the "Declination Letter").[13]

---

[11] A copy of Ms. Bennett's January 22, 2024 letter is attached hereto as **Exhibit H**.

[12] A copy of the email exchanges between Ms. Bennett and Leonard Cooper of Markel Service, Incorporated (MAIC's claim service manager) between January 26, 2024 and February 2, 2024 is attached hereto as **Exhibit I**.

[13] A copy of the May 2, 2024 Declination Letter is attached hereto as **Exhibit J.**

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

97.     By letter dated June 3, 2024, Kenneth Anspach (new coverage counsel for Catalyst Wealth) responded to the Declination Letter, disagreeing with MAIC's position and again requesting coverage for Underlying Claim under the Policy.[14]

98.     On June 9, 2024, Anspach wrote to MAIC's coverage counsel, Michael R. Delhagen with Tressler, LLC, advising that Diane Fowler's counsel, Alexander N. Loftus of Loftus & Eisenberg, Ltd., had issued a $2,000,000 Policy limits demand to settle the *Fowler* Lawsuit.[15]

99.     Anspach's June 9, 2024 letter demanded that MAIC accept Loftus' demand.  (See Ex. L.)

100.    On August 9, 2024, MAIC's coverage counsel Michael Delhagen responded to Anspach's June 3, 2024 letter, reiterating MAIC's denial of coverage for the Underlying Claim.[16] Delhagen's letter also memorialized telephone conferences that he had with Anspach concerning the Policy limits demand from Loftus:

> In your June 9, 2024 letter, you forward a letter dated June 4, 2024 from Alexander Loftus of Loftus & Eisenberg, Ltd., counsel for the underlying plaintiff in the Fowler Lawsuit. Mr. Loftus's June 4, 2024 letter purports to be a "policy limit demand," in which the Class seeks the remaining policy limits to settle the Fowler Lawsuit (the "Fowler Settlement Demand"). In your letter, you demand that Markel agree to settle the Fowler Lawsuit for $2 million based on Mr. Loftus's demand. However, based upon our further conversations, we understand that the Insured is not asking MAIC to fund the "limit" demand made by Loftus in connection with the Fowler Lawsuit at this time because doing so would leave no money available to fund possible resolutions of other matters at issue here, including the [CBL] Lawsuit. Please let me know if you would like to discuss this issue further.

(Ex. M at 4.)

101.    That same day, MAIC filed a declaratory judgment lawsuit against the Schmidt Defendants in the United States District Court for the Northern District of Illinois, seeking a

---

[14] A true and correct copy of the Anspach's June 3, 2024 letter is attached hereto as **Exhibit K**.

[15] A true and correct copy of the Anspach's June 9, 2024 letter is attached hereto as **Exhibit L**.

[16] A true and correct copy of Delhagen's August 9, 2024 letter is attached hereto as **Exhibit M**.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

declaration of no coverage under the Policy for the Underlying Claim in an action styled as *Markel Am. Ins. Co. v. Sanford Schmidt, et al.,* No. 1:24-cv-07052 (N.D. Ill. filed Aug. 9, 2024) (the "Federal Coverage Action").[17]

102.    On August 19, 2024, Anspach issued a letter to Delhagen denying that he ever modified or withdrew the Schmidt Defendants' demand that MAIC settle the *Fowler* Lawsuit for the remaining limits of the Policy.

103.    On September 20, 2024, Diane Fowler individually and as the purported representative of the putative class entered into a settlement agreement with Catalyst Wealth and Sanford Schmidt (the "*Fowler* Settlement Agreement").[18]

104.    The *Fowler* Settlement Agreement provides, *inter alia,* that "[t]he parties agree to stipulate to the entry of judgment in an amount up to $60,000,000 against Sanford Schmidt … to be satisfied solely through the assignments of all claims and rights to payment under the Policy …."  (See Ex. O, ¶24.(a).)

105.    The *Fowler* Settlement Agreement further provides that:

> If this Agreement is not approved by the Court or otherwise fails to become effective . . . this Agreement shall have no further force and effect, and the Parties will be returned to the status quo ante with respect to the Action as if this Agreement had never been entered into (other than as to notice and claims administrator costs which may have been incurred).

(*See* Ex. O, ¶35.)

123.    On September 26, 2024 – 19 days before Diane Fowler's Motion For Preliminary Approval Of Class Action Settlement was scheduled for hearing in the *Fowler* Lawsuit – Fowler's

---

[17] A true and correct copy of complaint (without exhibits) from the Federal Coverage Action is attached hereto as Exhibit **N**.  Simultaneous with the filing of this coverage lawsuit, MAIC is moving to voluntarily dismiss the Federal Coverage Action without prejudice.

[18] A true and correct copy of the *Fowler* Settlement Agreement is attached hereto as Exhibit **O**.

counsel Alexander N. Loftus entered his appearance on behalf of Catalyst Wealth in the Federal

Coverage Action.[19]

## COUNT I

**Declaratory Judgment – The Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter Constitute A Single Claim Under the Terms Of The Policy.**

124.     The allegations set forth in Paragraphs 1 through 123 above are re-alleged and

incorporated as if fully set forth herein.

125.     The Policy contains the following related claims provision:

**Interrelated Wrongful Acts**

All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as having been made in accordance with Section VI –Notice, whichever is earliest, whether before or during the Policy Period.

(Ex. A, Section IV.A.3.)

126.     The Lorenzen Demand*,* the *CBL* Lawsuit, the *Fowler* Lawsuit And the Muraff

Matter are based upon the same **interrelated wrongful acts**, i.e., actual or alleged acts, errors,

misstatements, misleading statements, negligent acts or omissions in connection with the Schmidt

Defendants' solicitation of investments in CWMF.

127.     Therefore, the Lorenzen Demand*,* the *CBL* Lawsuit, the *Fowler* Lawsuit And the

Muraff Matter constitute a single **claim** under the terms of the Policy.

## COUNT II

**Declaratory Judgment – The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter) Is Barred by the Policy's Exclusion - Specified Organization Endorsement.**

---

[19] A true and correct copy of Loftus' appearance in the Federal Coverage Action is attached hereto as **Exhibit P**.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

128.   The allegations set forth in Paragraphs 1 through 127 above are re-alleged and incorporated as if fully set forth herein.

129.   The Policy contains an Exclusion - Specified Person, Organization, Investment Vehicle, Service or Activity Endorsement that provides, in pertinent part:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:
>
> Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

130.   The Schedule to the Endorsement lists the Catalyst Wealth Management Fund I, LLC Fund as the "specified organization" for purposes of the exclusion.

131.   The Underlying Claim alleges, arises out of, is based upon and/or is attributable to the Catalyst Wealth Management Fund I, LLC Fund.  (*See* Ex. C, ¶24; Ex. D, ¶¶95 and 118; Ex. G.)

132.   The Underlying Claim, comprised of the Lorenzen Demand*, the CBL* Lawsuit, the *Fowler* Lawsuit and the Muraff Matter, is barred by the Policy's Exclusion - Specified Person, Organization, Investment Vehicle, Service or Activity Endorsement.

## COUNT III

**Declaratory Judgment – The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter) Is Barred by Exclusion J.2 – the Sale of Securities Exclusion.**

133.   The allegations set forth in Paragraphs 1 through 132 above are re-alleged and incorporated as if fully set forth herein.

134.   Pursuant to the Sale of Securities Exclusion, the Policy provides no coverage for:

> any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to: … [a]ny Purchase or sale of **securities** or insurance products for which an **insured** received commission or

31

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**.

135.    The term **security** is defined in the Policy to have the meaning assigned to that term by the following:

i.    The Securities Exchange Act of 1934;

ii.    The Securities Act of 1933;

iii.    The Investment Advisors Act of 1940 as amended; or

iv.    Any Rules issued by the Securities Exchange Commission pursuant to any of these acts[.]

136.    The Securities Act of 1933 defines "security", in relevant part, as a "note" or an "investment contract."

137.    The investments at issue in the Underlying Claim are **securities** as that term is defined in the Policy and the Schmidt Defendants received a commission or other remuneration in connection with same.

138.    Accordingly, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Underlying Claim.

## COUNT IV

**Declaratory Judgment – The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter) Is Barred by Exclusion J.1.**

139.    The allegations set forth in Paragraphs 1 through 138 above are re-alleged and incorporated as if fully set forth herein.

140.    Pursuant to Exclusion J.1., the Policy provides no coverage for:

Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

141.    The term **broker** is defined in the Policy to have "the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**."

142.    The Securities Act of 1934 defines the term "broker" to mean, in relevant part, "any person engaged in the business of effectuating transactions in securities for the account of others."

143.    Sanford Schmidt is a "broker" as that term is defined in the Policy.

144.    The term **security** is defined in the Policy to have the meaning assigned to that term by the following:

> b.    The Securities Exchange Act of 1934;
>
> c.    The Securities Act of 1933;
>
> d.    The Investment Advisors Act of 1940 as amended; or
>
> e.    Any Rules issued by the Securities Exchange Commission pursuant to any of these acts[.]

145.    The Securities Act of 1933 defines "security", in relevant part, as a "note" or an "investment contract."

146.    The investments at issue in the Underlying Claim are **securities** as that term is defined in the Policy.

147.    Because the Policy precludes coverage for activities of any **insured** as a **broker** (as that is defined in the Securities Act of 1934) in **securities**, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Underlying Claim.

## COUNT V

**Declaratory Judgment – The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter) Is Barred by The Policy's Prior Knowledge Exclusion.**

148.    The allegations set forth in Paragraphs 1 through 147 above are re-alleged and incorporated as if fully set forth herein.

149.    The MAIC Policy's Exclusion – Prior Knowledge Endorsement modifies Section III - Exclusions of the Policy and provides:

> This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

Any **wrongful act** or **interrelated wrongful acts** related to the Insuring Agreement(s) shown in the Schedule of this endorsement and occurring prior to the applicable Date shown in the Schedule of this endorsement which any **insured** knew or could reasonably have foreseen that such **wrongful act** or **interrelated wrongful acts** could lead to a **claim** under this Policy.

For the purpose of this exclusion, all actual or alleged **interrelated wrongful acts** will be deemed to have taken place on the date on which the earliest of such actual or alleged **wrongful acts** took place.

150.  The Schedule of this Endorsement lists December 31, 2020 as the Prior Knowledge Date for both the Investment Adviser Professional Liability and Professional Liability Coverage Part.

151.  The *CBL* Lawsuit, one of the **claims** constituting the Underlying Lawsuit, alleges that on December 30, 2020, Schmidt falsely claimed to CGL and others that two of the three films were complete.

152.  On this date, Schmidt also allegedly claimed that "a bidding" was imminent.

153.  Because the CBL Lawsuit alleges Schmidt's statements occurred on December 30, 2020, one day prior to the Prior Knowledge Date, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for Loss incurred in connection with the Underlying Claim.

## <u>COUNT VI</u>

**Declaratory Judgment – The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter) Is Barred by Exclusion R.**

154.  The allegations set forth in Paragraphs 1 through 153 above are re-alleged and incorporated as if fully set forth herein.

155.  Exclusion R. excludes, in relevant part, coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **claim** involving the amount, return, disgorgement or reimbursement of fees, commissions or other sums paid to an **insured**

34

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

for **investment advisory services** . . . rendered by an **insured;** provided, however, that this exclusion will not apply to **defense costs**.

156.     The *CBL* Lawsuit, one of the **claims** constituting the Underlying Claim, alleges that Sanford Schmidt unjustly profited from and retained compensation as a result of CBL's investment.

157.     Because the *CBL* Lawsuit alleges the return, disgorgement, or reimbursement of fees, commissions, or other sums paid to an Insured for investment advisory services and/or professional services rendered by Sanford Schmidt, MAIC has no duty to defend, indemnify, and/or reimburse the Defendants for **loss** incurred in connection with the Underlying Claim.

## COUNT VII

**Declaratory Judgment – Schmidt Financial Is Not Entitled To Coverage For The Underlying Claim (Comprised of the Lorenzen Demand, The *CBL* Lawsuit, The *Fowler* Lawsuit And The Muraff Matter)**

158.     The allegations set forth in Paragraphs 1 through 157 above are re-alleged and incorporated as if fully set forth herein.

159.     Pursuant to the definition of **insured**, the Policy provides limited coverage to Schmidt Financial under Insuring Agreement 2. as a **life and health insurance agency**, but that coverage is not implicated here.

160.     Specifically, Insuring Agreement 2. **Professional Liability Insurance** provides:

The Insurer will pay, on behalf of an **accounting firm**, **life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

161.     **Claim** is defined, in relevant part, to mean "1. [a]ny demand for monetary damages in a legal action . . . or "7. any written request to toll or waive any statute of limitations commenced by the receipt of such request . . . made upon an **insured** for a **wrongful act**."

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

162.    With respect to Insuring Agreement 2., **wrongful act** means "any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any . . . b. **life and health insurance agency** or its **insured persons,** solely in their capacities as such, in rendering or failing to render **life and health services**.

163.    **Life and health services** is defined in the Policy to mean "any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**."

164.    **Life insurance agent** is defined in the policy to mean:

> An individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

165.    The investments at issue in the Underlying Claim were not **life and health services** and therefore MAIC has no duty to defend, indemnify, and/or reimburse Schmidt Financial for **loss** incurred in connection with the Underlying Claim.

## <u>COUNT VIII</u>

### **Declaratory Judgment – MAIC Acted In Good Faith.**

166.    The allegations set forth in Paragraphs 1 through 165 above are re-alleged and incorporated as if fully set forth herein.

165.    The *Fowler* Settlement Agreement purports to assign to the putative class any action that the Schmidt Defendants might have against MAIC for bad faith.

166.    Under Illinois law, an insurer that issues a duty to defend policy such as the one at issue here when given notice of a claim potentially within the coverage of its policy has two options

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

defend the claim under a reservation of rights or initiate a declaratory judgment action seeking a declaration of no coverage. *L.A. Connection v. Penn-America Ins. Co.,* 363 Ill. App. 3d 259, 262, (3rd Dist. 2006), *citing Employers Ins. v. Ehlco Liquidating Trust,* 186 Ill. 2d 127 (1999).

167.    In the present instance, MAIC timely initiated the Federal Coverage Action and has acted in good faith with respect to its insureds.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Markel American Insurance Company, respectfully requests that judgment be entered in its favor and against the defendants as follows:

A.    A declaration that MAIC owes no duty to defend and no duty to indemnify with regard to the Underlying Claim;

B.    A declaration that MAIC acted in good faith towards its insureds;

C.    An award of costs of this suit to MAIC; and

D.    An award of such other and further relief as this Court deems just.

Respectfully Submitted,

MARKEL AMERICAN INSURANCE COMPANY

By:/s/  *Daniel R. Formeller*
Daniel R. Formeller
Sarah Hertz Maisel
Simone E. Haugen
Tressler LLP
233 South Wacker Drive – 61st Floor
Chicago, Illinois 60606-6399
(312) 768-2281
Dformeller@tresslerllp.com
SMaisel@tresslerllp.com
SHaugen@tresslerllp.com
*Attorneys for Plaintiff Markel American Insurance Company*

Joseph J. Borders
Kevin P. McJessy
McJessy, Ching & Thompson, LLC
3759 N. Ravenswood Ave., Ste. 231

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

Chicago, IL 60613
(773) 880-1260
borders@mcandt.com
mcjessy@mcandt.com
*Attorneys for Plaintiff Markel American Insurance*
*Company*

(10988-390) 4895-7150-9232, v. 1