**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION**

MARKEL AMERICAN INSURANCE
COMPANY,

        Plaintiff,

        vs.

SANFORD SCHMIDT; SCHMIDT ADVISORY
SERVICES, INC., d/b/a CATALYST WEALTH
MANAGEMENT, an Illinois corporation;
SCHMIDT FINANCIAL GROUP, LLC, an
Illinois limited liability company; ETHAN
SCHMIDT; JORDAN SCHMIDT,
CHRISTOPHER LORENZEN; CBL
INVESTMENTS, LLC; DIANE FOWLER; and
JAMES P. MURAFF,

        Defendants.

Case No.:  24-cv-10682

**MOTION TO DISMISS**

Defendants, SANFORD SCHMIDT, SCHMIDT ADVISORY SERVICES, INC., d/b/a

CATALYST WEALTH MANAGEMENT, SCHMIDT FINANCIAL GROUP, LLC, ETHAN

SCHMIDT, and JORDAN SCHMIDT, through their undersigned counsel, hereby moves to

dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(3).

**I.     INTRODUCTION[1]**

This isn't déjà vu. Markel American Insurance Company ("MAIC") did in fact just

voluntarily dismissed the same claims when a motion to compel arbitration was pending.  The day

---

[1] MAIC is apparently upset by Schmidt's choice of counsel. After trying every possible way to get MAIC to follow the Policy and pay the policy limits to the *Fowler* Class, Schmidt entered into a settlement whereby he agreed to the entry of a judgment against him and assignment of his bad faith claim against MAIC to Fowler and the Class of 137 Syndicated Loan Investors.  MAIC's glaring bad faith, refusal to engage in settlement discussions, and misunderstanding of the definition of a security and basic contract construction, make this a marvelous deal for the Class. With the underlying matter settled and the interests of the Class and Schmidt perfectly aligned against MAIC, it only makes sense that the proposed Class's counsel would pull the laboring oar in preserving the value of the settlement rather than relying on the impecunious Schmidt to defend this claim.

before the voluntary dismissal MAIC admitted the claims were coverage in a Cook County proceeding by arguing, "intervention is the *sole* way that MAIC can protect its interest regarding the claimed $60,000,000 award". MAIC then proceeded it to withdraw the petition to intervene when the argument was not going well. The next day MAIC refiled the same claims as were originally before this Court in Circuit Court of Cook County. Obviously the parties remain completely diverse as they were before and this foolhardy attempt to avoid arbitration is right back where it was a week ago.

Here we go again. This time, rather than previewing some key coverage issues, this time Defendants are narrowing the argument to arbitration and belaboring that point since it did not apparently register for MAIC last time around.

## II. LEGAL STANDARD

Rule 12(b)(3) allows a party to move for dismissal of an action when it is not filed in the proper venue. Fed. R. Civ. P. 12(b)(3). The plaintiff bears the burden of establishing that venue is proper. *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 222 (7th Cir. 1981). When considering a Rule 12(b)(3) motion, the Court takes all the allegations in the complaint as true, unless contradicted by an affidavit. *Hanyuan Dong v. Garcia*, 553 F. Supp. 2d 962, 964 (N.D. Ill. 2008)(Bucklo, J.).

An arbitration clause is a type of forum-selection clause. Motions to compel arbitration thus concern venue and are brought properly under Fed. R. Civ. P. 12(b)(3). Under Rule 12(b)(3) a district court still is free to consider materials submitted with a defendant's motion, including an arbitration clause.

### III.     ARGUMENT

### A.     THIS COURT IS AN IMPROPER VENUE FOR RESOLUTION OF PLAINTIFF'S CLAIMS ARISING OUT OF ITS AGREEMENT WITH SCHMIDT THAT REQUIRES ARBITRATION IF REQUESTED BY THE INSURED

The Seventh Circuit has held that a motion to dismiss based on a contractual arbitration clause is appropriately "conceptualized as an objection to venue, and hence properly raised under Rule 12(b)(3)." *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007); *see also Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). A party does not waive its right to arbitrate a dispute by filing a motion to dismiss or a motion to transfer venue. *Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 562 (7th Cir. 2008).

Arbitration is a creature of contract. *ACME-Wiley Holdings, Inc. v. Buck*, 343 Ill. App. 3d 1098, 799 N.E.2d 337, 341-42, 278 Ill. Dec. 619 (Ill. App. Ct. 2003) Generally, federal policy favors arbitration, and once an enforceable arbitration contract is shown to exist, questions as to the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).

Congress passed the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., to codify the federal policy favoring the resolution of disputes through arbitration. *Kawasaki Heavy Indus. v. Bombardier Recreational Prods.*, 660 F.3d 988, 994 (7th Cir. 2011). Section 2 of the FAA states that contractual provisions "to settle by arbitration a controversy thereafter arising out of such contract or transaction" are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 3 of the FAA requires courts to stay a proceeding and to compel arbitration of any matter covered by a valid arbitration

3

agreement. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011). A federal court may compel arbitration where there is (1) a written agreement to arbitrate, (2) a dispute within the scope of the agreement, and (3) a refusal to arbitrate by one of the parties to the agreement. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). Contract defenses, such as fraud, duress, and unconscionability, apply to agreements to arbitrate. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). The party seeking to avoid arbitration bears the burden of establishing why the arbitration agreement should not be enforced. *Green Tree Fin. Corp.-Ala. v. Randolp*h, 531 U.S. 79, 91-92 (2000).

There is no legitimate question that the claims arise out of or relates to the Policy considering it is expressly referenced in the complaint and attached to the Complaint. The Policy provides:

> Only if requested by the insured, **the Insurer <u>will submit any dispute, controversy</u> or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree.** If the parties cannot so agree, the arbitration will be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel will consist of one arbitrator selected by the insured, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

(Cmplt. Ex. "A" and attached hereto, Emphasis Added).

In this instance, the insured requested arbitration via email. The insured further requested arbitration via a motion seeking to enforce the arbitration clause (1:24-cv-07052 Dkt #8). Remarkably, MAIC ignored the plain language of the contract and unilaterally dismissed the action then filed another suit seeking the same relief! Here we are again requesting arbitration and seeking this Court's swift intervention on the obvious issue to avoid more whack-a-mole litigation.

4

"[T]he decision whether to compel arbitration is not discretionary. Where there is a valid arbitration agreement and the parties' dispute falls within the scope of that agreement, arbitration is mandatory and the trial court must compel it." *LRN Holding, Inc. v. Windlake Capital Advisors, LLC*, 409 Ill. App. 3d 1025, 1028 (2011). When presented with a motion to stay litigation pending arbitration pursuant to the FAA, "the court's inquiry is limited to whether an agreement to arbitrate exists and whether it encompasses the issue in dispute." *Jensen v. Quik International*, 213 Ill. 2d 119, 123 (2004). If "the court finds that an agreement to arbitrate exists and the issue presented is within the scope of that agreement, a stay is mandatory." *Id.* The FAA establishes that a written agreement to arbitrate contained in any contract evidencing a transaction involving interstate commerce is valid, irrevocable, and enforceable absent grounds for revocation of the contract. 9 U.S.C. § 2; *see Mitsubishi Motors Corp. v. Soler Chrysler- Plymouth*, 473 U.S. 614, 625 (1985). In determining whether a matter must be submitted to arbitration under the FAA, courts must determine (1) whether a valid agreement to arbitrate exists; and (2) whether the dispute falls within the substantive scope of the agreement. *Id.* at 626- 28. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Id.* at 626.

Furthermore, the Court must enforce the parties' agreement to arbitrate "gateway" questions about arbitrability of claims and the scope of the arbitration agreement. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010); *Grasty v. Colo. Tech. Univ.*, 599 F. App'x 596, 598 (7th Cir. 2015). In this case the parties agreed to employ AAA Commercial Arbitration Rules and incorporated them into the agreement. Though the Seventh Circuit has not addressed this issue, the consensus view among district courts in this circuit and among the other appellate circuits holds that reference to or incorporation of AAA rules constitutes clear and unmistakable evidence to delegate arbitrability to an arbitrator. *See . In re Dealer Mgmt. Sys. Antitrust Litig.*, 2020 U.S.

Dist. LEXIS 29052, 2020 WL 832365, *5 (N.D. Ill. 2020) (incorporating a delegation clause to the AAA Rules "constitutes clear and unmistakable evidence that the parties intended the question of arbitrability to be decided by an arbitrator" (quotations omitted)); *Bayer CropScience, Inc. v. Limagrain Genetics Corp., Inc.,* 2004 U.S. Dist. LEXIS 25070, 2004 WL 2931284, *4 (N.D. Ill. 2004) ("The inclusion of the phrase 'the arbitration shall be conducted . . . in accordance with the prevailing commercial arbitration rules of the American Arbitration Association' in the arbitration provision of the Agreement is clear and unmistakable evidence that the issue of arbitrability is to be submitted to the arbitrator."); *see also Yellow Cab Affiliation, Inc. v. N.H. Ins. Co.,* 2011 U.S. Dist. LEXIS 8304, 2011 WL 307617, *4 (N.D. Ill. 2011) (affirming that when parties mention the commercial rules of the AAA, arbitrability is a decision for the arbitrator); *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.,* 553 F. Supp. 3d 452, 458 (N.D. Ill. 2021)*; 20/20 Foresight, Inc. v. McGuffin,* No. 20 C 6915, 2021 U.S. Dist. LEXIS 29396, 2021 WL 619718, at *3 (N.D. Ill. Feb. 17, 2021*); Wilcosky v. Amazon.com, Inc.,* 517 F. Supp. 3d 751, 2021 WL 410705, at *11 (N.D. Ill. 2021)*; Crooms v. Sw. Airlines Co.,* 459 F. Supp. 3d 1041, 1055 (N.D. Ill. 2020). This consensus view finds its roots in AAA Commercial Rule 7(a), which expressly delegates arbitrability questions to the arbitrator, as follows: "**The arbitrator shall have the power to rule on his or her own jurisdiction**, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Am. Arb. Assoc., *Commercial Arbitration Rules and Mediation Procedures* 13 (2016), https://adr.org/sites/default/files/Commercial%20Rules.pdf.

This is not a close question. The insured requested his dispute be arbitrated and reiterated that in a Motion to Dismiss. Pursuant to the plain language of the policy the action must be compelled to arbitration and any dispute over arbitrability must be resolved by the arbitrator.

It is very clear that MAIC does not honor its contracts—whether as to coverage or arbitration. MAIC doesn't care what its contract says, and judicial intervention is necessary to enforce the plain language. The refusal to arbitrate is one of many glaring breaches of contract.

Accordingly, the Court should dismiss the action for the additional reason that venue in this judicial district is improper. Fed. R. Civ. P. 12(b)(3).

## CONCLUSION

WHEREFORE, SANFORD SCHMIDT, SCHMIDT ADVISORY SERVICES, INC., d/b/a CATALYST WEALTH MANAGEMENT, SCHMIDT FINANCIAL GROUP, LLC, ETHAN SCHMIDT, JORDAN SCHMIDT and DIANE FOWLER pray for an order dismissing Plaintiff's Complaint and awarding such other and further relief as the Court deems just including fees incurred in the recent needless dance between Courts and multiplicity of litigation.

Dated October 19, 2024

Respectfully submitted,
**SANFORD SCHMIDT, SCHMIDT ADVISORY SERVICES, INC., d/b/a CATALYST WEALTH MANAGEMENT, SCHMIDT FINANCIAL GROUP, LLC, ETHAN SCHMIDT, JORDAN SCHMIDT**
Defendants

By:

_Alexander Loftus_

One of Their Attorneys

Alexander Loftus, Esq.
David A. Eisenberg, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com
david@loftusandeisenberg.com

7

# EXHIBIT "A"



FILED DATE: 10/16/2024 12:35 PM 2024CH09499

**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

| POLICY NUMBER:<br><br>PL86085C | POLICY CHANGES EFFECTIVE:<br>7/1/23 | POLICY CHANGE NUMBER: 1 |
|---|---|---|
| **NAMED INSURED:**<br>Schmidt Advisory Services, Inc.<br>DBA: Catalyst Wealth Management<br>450 Skokie Blvd Ste 507<br>Northbrook, IL 60062 | | **PRODUCER NAME AND ADDRESS:**<br>ARC Excess & Surplus LLC |

THIS ENDORSEMENT MODIFIES INSURANCE UNDER THE FOLLOWING:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following item(s):

| | | | |
|---|---|---|---|
| ☐ | Named Insured | ☐ | Mailing Address |
| ☐ | Policy Period | ☐ | Insured Legal Status/Business Of Insured |
| ☐ | Retroactive Date | ☒ | Policy Premium |
| ☐ | Effective/Expiration Date | ☐ | Retention |
| ☐ | Payment Plan | ☐ | Endorsements |
| ☐ | Limit(s) Of Liability | ☐ | Rates/Scheduled Rating |
| ☐ | Other: Specify – | | |

is (are) changed to read as shown below:
In consideraiton of the additional premium shown below, the declarations page has been updated.

All other terms and conditions remain unchanged.

| PREMIUM ADJUSTMENT | | |
|---|---|---|
| ☐ NO CHANGES | ADDITIONAL PREMIUM | RETURN PREMIUM |
| | $1,311.00  Total | |

_____
Authorized Representative Signature

MPL 1214 10 16                                                                 **Page 1 of 1**

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

# Policy renewal information

**Markel account number:** ACCT10198

**Renewal policy number:** PL86085C

**Renewal term:**          01/30/2023 - 01/30/2024

**Insured name:**          Schmidt Advisory Services, Inc.

**Thank you for choosing Markel**
We greatly appreciate your business and the continued opportunity to provide you with the coverage you need for another term.

Should you have questions or concerns about your renewal, or changes have occurred within your operation, please contact your insurance agent.

ARC Excess & Surplus LLC
P.O. Box 9012
Jericho, NY 11753
(516) 747-4100

**Important notice - Policy expiration**
Your current insurance will expire at 12:01 a.m. on
01/30/2023 _____. This is subject to the terms and conditions indicated in your contract.

In order to continue your coverage, please make your premium payment to Markel prior to the expiration date. 01/30/2023

**About your renewal - Review your policy**
Please take a minute to thoroughly review your policy to be sure everything is in order.



MAIC000002

FILED DATE: 10/16/2024 12:35 PM   2024CH09499



# Your E&O policy

Markel's Investment Advisor Professional Liability program has been providing Errors & Omissions insurance to investment advisors and divorce financial consultants for three decades. Our leadership has a wealth of knowledge and experience in advisory practice management, as well as in the claims process. Our team of underwriters can work with you to structure an insurance policy that fits your specific needs, while our seasoned claims professionals will help you to successfully navigate a loss or claim.

## Key reminders

### Strong defense provision

- "Right and duty" to defend policy — contractual obligation to defend against covered wrongful acts.
- Our policy is required to pay both defense costs and damages owed.

### Incident trigger

- You can contact us about a potential claim before you have an actual written claim. We can often navigate, mitigate, or eliminate the incident before it escalates.

## Submitting a formal claim

1. Please contact your insurance broker immediately. (for assistance please call us at 800-691-1515)
2. Send an email with all claim information to newclaims@markelcorp.com and investmentadvisors@markelcorp.com.
3. You can follow up on a claim by contacting Leonard Cooper at 212-551-2287 or lcooper@markelcorp.com.

## Hotline

### Risk management and loss prevention

Policyholders have access to our risk management and loss prevention hotline. This hotline allows policyholders to discuss potential claim scenarios with an attorney. Markel will pay up to $10,000 (without triggering the deductible) in investigative costs if the policyholder calls us before a claim is filed.

In order to access the risk management and loss prevention hotline, please visit: markelinvestmentadvisors.com and select "Claim advice". The policyholder will be prompted to provide their policy number in order to receive access to the hotline.

P.O. Box 2009
Glen Allen, VA 23058-2009
Phone: 800-691-1515 Fax: 802-864-9369
Email: investmentadvisors@markelcorp.com

**For more information about our program, risk management articles, and FAQs, please visit markelinvestmentadvisors.com.**



8/6/18                                            MAIC000003

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**A STOCK COMPANY**



# Markel American Insurance Company

4600 Cox Road

Glen Allen, VA 23060

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

Secretary                                        President

MJIL 1000 06 10                                        Page 1 of 1

MAIC000004



**PROFESSIONAL LIABILITY**

# MARKEL AMERICAN INSURANCE COMPANY

## POLICYHOLDER DISCLOSURE NOTICE OF CERTIFIED ACTS OF TERRORISM COVERAGE

**Disclosure** You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2015 the definition of terrorism has changed. A*s defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires the Insurer to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**Disclosure Of Premium**

Certified acts of terrorism coverage is provided for no additional premium.

MAIC000005



# MARKEL AMERICAN INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                   Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br>Personal information does not include:<br>• publicly-available information from government records;<br>• de-identified or aggregated consumer information.<br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

**MPIL 1007 01 20**                                      **Page 1 of 3**

MAIC000006

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you<br>• complete an application or other form for insurance<br>• perform transactions with Us, Our Affiliates, or others<br>• file an insurance claim or provide account information<br>• use your credit or debit card<br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only<br>• sharing for Affiliates' everyday business purposes – information about your creditworthiness<br>• Affiliates from using your information to market to you<br>• sharing for Nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

MPIL 1007 01 20     **Page 2 of 3**

MAIC000007

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br><br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |

MPIL 1007 01 20

**Page 3 of 3**

MAIC000008

FILED DATE: 10/16/2024 12:35 PM   2024CH09499



# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDERS
## CLAIM REPORTING

Please immediately report a new claim under this policy to:

**newclaims@markel.com**

For general claims inquiries after a claim has been reported, please email:

**markelclaims@markel.com**

In order for us to expedite the handling of your claim and quickly refer it to the appropriate party, please have the following information available:

- Claim number (or report as new)
- Your name, contact information and position with the Named Insured
- Date of loss
- Policy number and insured name
- Details of loss

Our address and additional contact information are as follows:

Markel Claims
P.O. Box 2009
Glen Allen, VA 23058-2009
Phone:  800-362-7535 (800) 3MARKEL
Fax:  855-662-7535 (855) 6MARKEL

Markel understands the importance of having knowledgeable claims professionals prepared to answer your questions with personal attention and expertise. With claims professionals located across four times zones, you are sure to find the claims assistance you need -- when you need it.

**PLEASE REFER TO THE POLICY FOR ANY NOTICE AND REPORTING PROVISIONS
AND DUTIES IN THE EVENT OF LOSS OR DAMAGE TO COVERED PROPERTY.**

MPIL 1074 02 20            Page 1 of 1

MAIC000009

INTERLINE

**Markel American Insurance Company**

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

| | | |
|---|---|---|
| **MPIL 1083 04 15** | Includes copyrighted material of Insurance Services Office, Inc. with its permission. | **Page 1 of 1** |

MAIC000010



FILED DATE: 10/16/2024 12:35 PM   2024CH09499

# MARKEL AMERICAN INSURANCE COMPANY

## NOTICE TO POLICYHOLDER

## ILLINOIS
## IMPORTANT NOTICE

This notice is to advise you that should any complaints arise regarding this insurance; you may contact our office or the Illinois Department of Insurance.

The address of the Markel office where complaints will be addressed is:

4521 Highwood Parkway
Glen Allen, Virginia  23060

If you desire to contact the Illinois Department of Insurance for information concerning your policy, the address(s) are shown below:

Illinois Department of Insurance
320 West Washington Street
Springfield, Illinois 62767-0001
1-866-445-5364
Fax 217-558-2083

Or

Illinois Department of Insurance
122 S. Michigan Ave.
Chicago, Illinois 60603

Consumer Complaint forms may be completed and submitted online or downloaded and printed to mail or fax to the Department through the Department's website:

https://mc.insurance.illinois.gov/messagecenter.nsf  (online form)

https://insurance.illinois.gov/Complaints/PropertyCasualtyComplaintForm.pdf  (printable format)

MPIL 1113-IL 04 18                                                                                         Page 1 of 1

MAIC000011

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

# Markel American Insurance Company



# INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY PROVIDES COVERAGE ONLY FOR WRONGFUL ACTS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.

THE AMOUNTS INCURRED AS DEFENSE EXPENSES WILL REDUCE THE LIMIT OF LIABILITY, UNLESS THE POLICY IS AMENDED BY ENDORSEMENT.

PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT WITH YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS IN THIS POLICY.

POLICY NUMBER: PL86085C                    RENEWAL OF POLICY: PL86085B

**Named Entity and Mailing Address** (No., Street, Town or City, County, State, Zip Code)
Schmidt Advisory Services, Inc.,
DBA: Catalyst Wealth Management
450 Skokie Blvd Ste 507
Northbrook, IL 60062

Policy Period: From   01/30/2023   To   01/30/2024   at 12:01 A.M. Standard Time at the address of the Named Entity shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| Limits Of Liability And Retentions | | |
|---|---|---|
| **Insuring Agreement** | **Limits Of Liability** | **Retentions** |
| 1. Investment Adviser Professional Liability Insurance: | $2,000,000 Each Loss | $100,000 Each Loss |
| 2. Professional Liability Insurance: | $2,000,000 Each Loss | $100,000 Each Loss |
| 3.a. Directors And Officers Liability Insurance: | Not Covered Each Loss | Not Applicable |
| 3.b. Directors And Officers Liability Insurance: | Not Covered Each Loss | Not Covered Each Loss |
| 3.c. Directors And Officers Liability Insurance: | Not Covered Each Loss | Not Covered Each Loss |
| Fiduciary Liability Insurance: | Not Covered Each Loss | Not Covered Each Loss |
| Voluntary Settlement Programs: | Not Covered Each Loss | Not Applicable |
| **Aggregate Limit Of Liability:** $2,000,000 | All losses under all purchased Insuring Agreements combined | |

| Producer Number, Name and Mailing Address |
|---|
| ARC Excess & Surplus LLC<br>P.O. Box 9012, Jericho, NY 11753 |

MDPL 1002 05 19                                              Page 1 of 3

MAIC000012

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

## Employment Practices Liability

This Policy includes this Coverage only if designated below by "X" as purchased. If the Coverage is not expressly designated as purchased, this Policy does not include this Coverage.

| Coverage | Limits Of Liability | Retentions |
|---|---|---|
| ☐ Employment Practices Liability: | Not Covered | Not Covered Each Claim |
| ☐ Wage And Hour Claims: | Not Covered Aggregate | Not Applicable |
| ☐ Third Party Discrimination Liability: | Not Covered | Not Covered Each Claim |

## DataBreach<sup>SM</sup> Network And Information Security And Media Injury Liability Coverage

This Policy includes only those Coverages designated below by "X" (☒) as purchased. If Coverage is not expressly designated as purchased, this Policy does not include such Coverage.

| Coverage | Limits Of Liability | Deductible (Retention) | Retroactive Date |
|---|---|---|---|
| ☐ Network And Information Security Liability: | Not Covered Each Claim<br>Not Covered Aggregate | Not Covered Each Claim | |
| Regulatory Fines: | Not Covered Each Claim<br>Not Covered Aggregate | Not Covered Each Claim | |
| ☐ Media Injury Liability: | Not Covered Each Claim<br>Not Covered Aggregate | Not Covered Each Claim | |
| ☐ Network Security Loss: | Not Covered Each Unauthorized Access<br>Not Covered Aggregate | $0 Each Unauthorized Access | |
| Network Security Business Interruption Loss: | Not Covered Each Business Interruption Event<br>Not Covered Aggregate | Not Covered Retention Period For Each Business Interruption Event | |
| ☐ Breach Mitigation Expense: | Not Covered Each Unintentional Data Compromise<br>Not Covered Aggregate | Not Covered Each Unintentional Data Compromise | |
| ☐ PCI Assessments: | Not Covered Each Payment Card Breach<br>Not Covered Aggregate | Not Covered Each Payment Card Breach | |
| ☐ Funds Transfer Fraud Loss: | Not Covered Each Funds Transfer Fraud Incident<br>Not Covered Aggregate | Not Covered Each Funds Transfer Fraud Incident | |
| ☐ Social Engineering Loss | Not Covered Each Social Engineering Incident<br>Not Covered Aggregate | Not Covered Each Social Engineering Incident | |
| Combined Network And Information Security And Media Injury Liability Coverage: | | Combined Aggregate | |

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

| Additional And Supplementary Payments | |
|---|---|
| **Coverage** | **Limits Of Liability** |
| Additional Payment Loss Control And Investigative Expenses: | $10,000 |
| Supplementary Payments | |
| Regulatory Investigation Expenses and Subpoena Expense: | $10,000 |

| Fiduciary Liability Insurance | |
|---|---|
| **Extensions** | **Limits Of Liability** |
| HIPAA Claims And COBRA Claims: | Not Covered |
| PPACA Claims: | Not Covered |
| Disclosure Provision Penalties: | Not Covered |
| Settlor Capacity Claims: | Not Covered |
| **Pending And Prior Proceeding Date** | |
| Fiduciary Liability Insurance Pending And Prior Proceeding Date: | |
| **Multiemployer Plan Or Employee Stock Ownership Plan** | **Description/Limit** |
| Name Of Plan:     Not Covered | |
| Type Of Plan:     Not Covered | |
| Sublimit Amount: | Not Covered |
| Retention Amount: | Not Covered |
| Coinsurance Percentage: | Not Covered |

| Pending And Prior Proceeding Date |
|---|
| Pending And Prior Proceeding Date:  12/31/2020 |

| Extended Reporting Period | |
|---|---|
| 100% OF POLICY PREMIUM | 1 Year |

| Policy Premium |
|---|
| $30,681.00   Policy Premium |
| $30,681.00   Payable at Inception |
|                      Policy Writing Minimum Premium |

| Endorsements |
|---|
| Forms and Endorsements applying to this Policy and made part of this Policy at time of issue: See MDIL 1001 Attached. |

**These Declarations, together with the Policy, Endorsement(s), Application, and any other attachments complete the above numbered Policy.**

Countersigned: _____06/29/2023_____     By: _____
                                    **DATE**                                                **AUTHORIZED REPRESENTATIVE**

MAIC000014

POLICY NUMBER: PL86085C

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

# Markel American Insurance Company

## FORMS SCHEDULE

| Form Number | Form Name |
|---|---|
| MJIL 1000 06 10 (MAIC) | Signature Page - MAIC |
| MDPL 1002 05 19 | Investment Adviser, Professional Services And Directors And Officers Liability Declarations |
| MPL 0002 05 19 | Investment Adviser, Professional Services And Directors And Officers Liability Policy |
| MP 1214 10 16 | Policy Changes |
| MPL 1216 07 17 | Certified Acts Of Terrorism |
| MPL 1224 07 17 | Life Product Sales Coverage - Named Individuals |
| MPL 1230 07 17 | Schedule Of Life And Health Insurance Agencies |
| MPL 1232 07 17 | Supplemental Coverage Extension |
| MPL 1255 05 19 | Changes - Coverage Territory |
| MPL 1313 05 19 | Exclusion - Prior Knowledge |
| MPL 1315 07 17 | Exclusion - Reimbursement Of Fees |
| MPL 1320 07 17 | Exclusion - Warranty Or Guarantee Of Future Assets |
| MPL 1323 05 19 | Exclusion - Specified Person, Organization, Service Or Activity |
| MPL 1484-IL 05 19 | Illinois Amendatory |
| MIL 1214 09 17 | Trade Or Economic Sanctions |

MAIC000015

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**

# MARKEL AMERICAN INSURANCE COMPANY

## INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO ITS TERMS, THIS POLICY PROVIDES COVERAGE ONLY FOR CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER IN WRITING DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.

THE AMOUNTS INCURRED AS DEFENSE EXPENSES WILL REDUCE THE LIMIT OF LIABILITY AVAILABLE, UNLESS THE POLICY IS AMENDED BY ENDORSEMENT. PLEASE READ THIS ENTIRE POLICY CAREFULLY. CONSULT WITH YOUR BROKER OR OTHER REPRESENTATIVE IF YOU DO NOT UNDERSTAND ANY TERMS OR PROVISIONS OF THIS POLICY.

Throughout this Policy, the words "Named Entity" refer to the Named Entity shown in the Declarations. The word "Insurer" refers to the Company providing this insurance.

Some words that appear in **bold** typeface have special meaning. Refer to Section **II** – Definitions.

## SECTION I – COVERAGE

### A. Insuring Agreements

The Insurer, relying on the statements in the **application**, agrees with the Named Entity as follows:

Coverage is provided under the following Insuring Agreement(s) only if a Limit Of Liability for such Insuring Agreement(s) is shown in the Declarations.

1. **Investment Adviser Professional Liability Insurance**

   The Insurer will pay, on behalf of an **insured adviser** or its **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

2. **Professional Liability Insurance**

   The Insurer will pay, on behalf of an **accounting firm**, **life and health insurance agency** or **professional service provider** or their **insured persons**, **loss** which they become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

3. **Directors And Officers Liability Insurance**

   a. The Insurer will pay, on behalf of the **insured executives**, **loss** which the **insured executives** become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable, and for which the Named Entity or **insured entity** has not indemnified them. This Paragraph **a.** does not apply to **loss** which the Insurer pays pursuant to Paragraph **b.** of this Insuring Agreement **3.**

   b. The Insurer will pay, on behalf of an **insured entity**, **loss** which the **insured entity** has indemnified the **insured executives**, and which the **insured executives** have become legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

   c. The Insurer will pay, on behalf of an **insured entity**, **loss** which the **insured entity** becomes legally obligated to pay as a result of a **claim** first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

MAIC000016

**B. Additional Payment Loss Control And Investigative Expenses**

If, during the Policy Period or Extended Reporting Period, if applicable, the **insured** provides the Insurer with written notice of a **wrongful act** that is reasonably expected to result in a **claim**, but as to which no **claim** has yet been made, the Insurer may, at its sole option, choose to investigate the **wrongful act**. Such an investigation will be at the Insurer's expense and will not reduce the applicable Limits Of Liability or be subject to the Retention provisions of this Policy until one of the following occurs:

1. A **claim** results from the **wrongful act** under investigation; or

2. The Insurer incurs $10,000 in expenses, unless a higher limit is shown in the Declarations, arising from the investigation.

If a **claim** is made and reported to the Insurer, or once the Insurer incurs $10,000 in investigative expenses, unless a higher limit is shown in the Declarations, any further payment will be considered **defense costs** and will reduce the applicable Limits Of Liability and be subject to the Retention provisions of this Policy.

**C. Supplementary Payments**

The Insurer will pay up to $10,000, unless a higher limit is shown in the Declarations, for the sum of all **regulatory investigation expenses** or **subpoena expense** incurred by the **insured**.

These payments are in addition to the Limits Of Liability and will not be considered as payment of **loss** or **defense costs**. The Retention does not apply to these payments.

## SECTION II – DEFINITIONS

**A. Accounting firm** means any entity specifically listed on the Schedule Of Accounting Firms endorsement to this Policy that renders **accounting services**, but only while such entity is acting on behalf of the Named Entity.

**B. Accounting service(s)** means any services specialized in accounting and specifically listed on the Schedule of Accounting Firms endorsement pursuant to a written agreement between the **accounting firm** and an **insured** for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **accounting firm**.

**C. Application** means each and every signed application, any attachments to such applications, or other materials or documents submitted or incorporated in connection with the underwriting of this Policy and includes the underwriting of any other investment advisory liability policy, life and health insurance policy, professional service liability policy, miscellaneous errors and omissions policy, bookkeepers policy, accountants policy or director or officer policy issued by the Insurer, or any of its affiliates, of which this Policy is a renewal, replacement or which it succeeds in time. It will also mean any public documents filed within 12 months of the inception date of this Policy by the Named Entity or any other **insured** with the Securities and Exchange Commission (SEC), or any similar federal, state, local or other regulatory body, domestic or foreign, and any other written public statement or certification required by law to be made regarding the accuracy, completeness or adequacy of the Named Entity's or other **insured's** financial statements, SEC filings or internal controls, whether or not such public documents, statements or certifications were furnished to the Insurer.

**D. Broker** will have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **broker** does not include a person who is a **registered representative**.

**E. Claim** means:

1. Any demand for monetary damages in a legal action, mediation, arbitration or injunctive relief;

2. A civil proceeding commenced by the service of a complaint or similar pleading;

3. An **execution error**;

4. A criminal proceeding commenced by the return of an indictment, information or similar document;

5. Any administrative or regulatory proceeding commenced by the filing of a notice of charges, service or filing of a complaint, receipt of a Wells Notice or receipt or filing of any other pleading or document similar or comparable to the foregoing;

6. Any investigation of the **insureds** initiated by any governmental body or self-regulatory organization after service of a subpoena, Wells Notice, "target letter" (within the meaning of Title 9, §11.151 of the United States Attorney's Manual), civil investigative demand or other notice of investigation or other similar document or notification;

7. Any written request to toll or waive any statute of limitations commenced by the receipt of such request;

MAIC000017

8. Any written request or other written statement seeking extradition or rendition of an **insured** commenced by the receipt of such written request or statement; or

9. Any foreign equivalent of any of the foregoing;

made upon an **insured** for a **wrongful act**.

F. **Dealer** will have the meaning assigned to that term by the Securities Exchange Act of 1934, as amended, but **dealer** does not mean a person who is a **registered representative**.

G. **Defense cost(s)** means reasonable and necessary fees, costs, charges, and expenses incurred in the investigation, defense or appeal of any **claim** and the costs of appeal, attachment or similar bonds (but does not include applying for or furnishing such bond).

**Defense costs** do not include fees, salaries, regular or overtime wages, overhead, benefits or extradition expenses.

H. **Electronic communications system** means any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications; any electronic data processing systems or related electronic equipment for the storage of such communications; or any computer.

I. **Electronic data** means facts or information converted to a form usable in an **electronic communications system** and which is stored for use by computer programs.

J. **ERISA** means the Employee Retirement Income Security Act of 1974, the Pension Protection Act of 2006, as amended and any rules or regulations promulgated thereunder.

K. **Execution error** means any **claim** based upon, arising out of, or relating to the erroneous execution or failure to execute an order to transfer, purchase or sell **securities** by an **insured**.

L. **Financial impairment** means the status of an **insured entity** resulting from:

1. The appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **insured entity**; or

2. Becoming a debtor in possession under United States bankruptcy law or the equivalent under the law of another jurisdiction, including the law of another country.

M. **Financial planning services** means financial or investment advice given to individuals or their owned business organizations as part of a written financial plan, comprehensive or modular, including advice with respect to personal risk management, investments, estate planning, retirement planning, college planning and taxes.

N. **Forged** means the signing of the name or electronic manipulation of the name of another natural person with the intent to deceive, but does not mean a signature which consists in whole or in part of one's own name, with or without authority, in any capacity for any purpose.

O. **Fraudulent transfer request** means an email or other instruction fraudulently declared to have been sent by a customer but which communications were either not sent by such customer or were **forged**, fraudulently modified during physical transit of electronic media to the **insured** or during electronic transmission to the **insured's electronic communications system**.

P. **Insured(s)** means the Named Entity, **insured entity(ies)** and the **insured person(s)**.

Q. **Insured adviser(s)** means the Named Entity that is a registered "investment adviser" as defined in the Investment Advisers Act of 1940, and its amendments, and which renders **investment advisory services** to others.

R. **Insured entity(ies)** means the **accounting firm(s)**, **insured adviser(s)**, **life and health insurance agency(ies)** or **professional service provider(s)**.

S. **Insured executive(s)** means any person who has been, now is or becomes a duly elected or appointed partner, director, officer, chief compliance officer, managing member, manager or trustee of an **insured entity**.

T. **Insured person(s)** means:

1. The **insured executives**;

2. The chief compliance officer;

3. Any person who has been, now is or will become an employee of an **insured entity**, but solely while providing **accounting services**, **investment advisory services**, **life and health services** or **professional services** on behalf of such **insured entity**;

MAIC000018

4. The estates, heirs, or legal representatives of any person described in Paragraphs **1.** and **2.** above in the event of their death, incompetency, insolvency or bankruptcy ; or

5. The lawful **spouse** of any person described in Paragraphs **1.** through **3.** above, but solely with respect to a **claim** arising solely out of his or her status as the **spouse** of such person; provided, however, an **insured person** does not include a lawful **spouse** with respect to a **claim** against such person for his or her own **wrongful acts**.

   **Insured person** does not include independent contractors unless specifically endorsed by name to this Policy.

U. **Interrelated wrongful acts** means **wrongful acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes, including, but not limited to a Pyramid Scheme or Ponzi Scheme. As used herein, a Pyramid Scheme means an investment program in which investors are paid returns primarily through the enrollment of others into the program. As used herein a Ponzi Scheme means an investment program in which investors are paid returns primarily out of the money paid by subsequent investors in the program.

V. **Investment advisory services** means **financial planning services**, or financial, economic or investment advice regarding investments or investment management services performed or required to be performed by an **insured adviser** for or on behalf of a customer pursuant to a written agreement between such customer and the **insured adviser** for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **insured adviser**. In addition, **investment advisory services** includes service performed:

1. As a fiduciary adviser as defined under Section 601 of the Pension Protection Act of 2006;

2. As a functional fiduciary commonly defined or described in Section 3(21) of **ERISA** when performing a covered service and solely arising out of rendering investment advice for a fee or other compensation;

3. As a fiduciary as an investment manager defined or described in Section 3(38) of **ERISA** when performing a covered service;

4. Or related **securities** or insurance purchases or sales by an **insured** within the normal scope of retirement or benefit planning services performed by an **insured adviser**.

W. **Life and health insurance agency** means any entity specifically listed on the Schedule of Insurance Agencies endorsement to this Policy that renders **life and health services**, but only while such entity is acting on behalf of the Named Entity.

X. **Life and health services** means any **life insurance agent** duties performed or required to be performed in the regular course of business for a fee, commission, other monetary consideration, **pro bono** or other remuneration which inures to the benefit of the **life insurance agent**.

Y. **Life insurance agent** means an individual licensed, as required by any applicable Federal law and the law of the state where any part of the transaction occurs, to sell life, health, disability, fixed annuities, long term care or accidental death and dismemberment insurance, including activities as a licensed life insurance consultant. **Life insurance agent** does not include anyone selling **non-traditional life insurance products** or anyone while acting as a general agent or in any similar capacity for a life insurance company.

Z. **Loss** means the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages (including punitive, exemplary, or multiplied damages, unless uninsurable under the law of the jurisdiction most favoring coverage for such damages), judgments, settlements, pre-judgment and post-judgment interest and **defense costs**.

   **Loss** does not include:

1. Any costs incurred by an **insured** to comply with any order for injunctive or other non-monetary relief, any agreement to provide such relief or any regulatory or administrative directive;

2. Taxes imposed on an **insured**, fines or penalties, except as provided above with respect to punitive, exemplary, or multiplied damages;

3. Any amount not insurable under the law pursuant to which this Policy is construed, except as provided above with respect to punitive, exemplary or multiplied damages;

4. Regular or overtime wages, salaries, commissions, or fees of **insured persons**; or

5. Any fees, charges, commissions or other compensation paid to an **insured**, including allegedly excessive or improper fees.

MPL 0002 05 19                                                                                                    **Page 4 of 14**

**AA.Non-traditional life insurance products** means viatical agreements, private placement life insurance products, life settlements, life settlement-backed securities (death bonds), senior settlements and any product originally issued in relation to a structured settlement, including but not limited to structured settlement factoring transactions as defined in the Internal Revenue Code.

**BB.Personal injury** means false arrest, wrongful detention or imprisonment, malicious prosecution, abuse of process, defamation, disparagement (including libel and slander), invasion of privacy, invasion of the right of private occupancy, or wrongful entry or eviction.

**CC.Pollutants** means, but is not limited to, any solid, liquid, gaseous, or thermal irritant or contaminant, including without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, mold, fungi odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, waste and any electric, magnetic or electromagnetic field of any frequency.

**DD.Private data** means data containing:

1. An individual's driver's license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number, each when in combination with the security code, access code, password or pin for such account or card number;

2. Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999 (GLBA), as amended, and regulations issued pursuant thereto;

3. Protected healthcare information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

4. Private personal information as defined under a **security breach notice law**; and

5. Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information;

not including any lawfully available data accessible by the general public.

**EE. Pro bono** means **accounting services**, **investment advisory services**, **life and health services** or **professional services** done for the public good and benefit, voluntarily and without payment.

**FF. Professional service(s)** means services rendered for or advice given to others by an **insured** for a fee, remuneration, **pro bono** or other consideration in an **insured's** business and explicitly listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy.

**GG.Professional service provider** means any individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement or other endorsement to this Policy that renders **professional services**, but only while such individual or entity is acting on behalf of the Named Entity.

**HH.Registered representative** means a person who:

1. Is registered with the Financial Industry Regulatory Authority (FINRA) or its successor as a **registered representative** of a **broker** or **dealer** pursuant to the provisions of the Securities Exchange Act of 1934; and

2. Is in the business of buying and selling **securities** for the account of others, including but not limited to, direct participation products such as limited partnerships, shares in mutual funds, unit investment trusts and variable annuities.

   **Registered representative** does not include any person while acting in the capacity of a principal of a **broker** or **dealer**, including but not limited to a General Securities Principal or Limited Principal General Securities Sales Supervisor.

**II. Regulatory investigation expenses** means attorney fees, attorney costs and court costs if, during the Policy Period, the **insured** becomes involved in an investigation or an administrative, arbitration or regulatory proceeding commenced by the filing of a notice of charges, investigative order, or subpoena that:

1. Is initiated by a federal, state or self-regulatory agency;

2. Results from an act or omission in the rendering of **accounting services**, **investment advisory services**, **life and health services** or **professional services**;

3. Is reported in accordance with the terms and conditions of this Policy; and

4. Is first made against them and reported during the Policy Period or Extended Reporting Period, if applicable.

MAIC000020

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**JJ. Security** has the meaning assigned to that term by the following:

1.  The Securities Exchange Act of 1934;

2.  The Securities Act of 1933;

3.  The Investment Advisers Act of 1940 as amended; or

4.  Any rules issued by the Securities Exchange Commission pursuant to any of these acts.

**Securities** means the plural of **security** as defined herein.

**KK. Security breach notice law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Entity to notify individuals of the compromise or possible compromise of the security of their confidential information in the Named Entity's care, custody or control; the European Union (EU) Data Protection Act of 1995; and the General Data Protection Regulation.

**LL. Spouse** means a person related by marriage or party to a civil union or domestic partnership recognized under any applicable federal, state or local law.

**MM. Subpoena expense** means costs and fees associated with:

1.  An **insured** responding to a subpoena; and

2.  The Insurer assisting an **insured** in responding to a subpoena;

that an **insured** receives during the Policy Period and which:

    a.  Arises from a lawsuit in which an **insured** is not named as a defendant; or

    b.  Summons an **insured** to provide documents or testimony for an i**nsured** witnessing of an act or omission of **accounting services**, **life and health services** or **professional services**. This coverage does not apply if an **insured** is summoned solely for providing advice or expert testimony.

The Insurer's assistance will include, at an **insured's** request:

    (1) Providing or assisting in the retention of an attorney to prepare an **insured** for giving sworn testimony;

    (2) Providing an **insured** with advice regarding the production of documents; or

    (3) Representing an **insured** at the hearing.

**Subpoena expense** does not include salary, wages, overhead, benefit expenses or expenses of partners, principals, officers, directors, members or employees of the **insured** or the Insurer.

**NN. Unauthorized access** means a breach of the Named Entity's **electronic communications system**, including:

1.  Any intentional violation, interception, or use or misuse of the Named Entity's **electronic communications system**, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the **insured**;

2.  Access to the Named Entity's **electronic communications system** that is with the **insured's** permission where such permission is the result of fraud or deception, including phishing scams;

3.  Use of the Named Entity's **electronic communications system** by a party, including but not limited to a rogue employee, authorized by the **insured** to use such system, who does so for an unauthorized purpose;

4.  The introduction of viruses, malware, or other programs into the Named Entity's **electronic communications system** which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

5.  A credible threat or an extortion demand, including but not limited to a threat or demand by ransomware, received by the **insured** threatening or portending loss, injury or damage to:

    a.  The Named Entity's **electronic communications system**, including programs, **electronic data** and media which form a part of the Named Entity's **electronic communications system**; or

    b.  Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Entity's **electronic communications system**;

for the purpose of extorting money or other valuable consideration from the Named Entity ; or

MAIC000021

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

6.  Failure to prevent a denial of service attack on the Named Entity's **electronic communications system** or to prevent the use of the Named Entity's **electronic communications system** by an unauthorized user or code to launch a denial of service attack on a third party.

**OO. Unintentional data compromise** means:

1.  Any computer security incident, intrusion, breach, compromise, theft, loss or misuse of **private data** maintained by the Named Entity, including the theft or loss of any paper records;

2.  The failure of any third party to prevent the unauthorized viewing, copying or distribution of **private data** which the Named Entity has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **private data** so entrusted; or

3.  Unintentional breach of the Named Entity's written privacy policy.

**PP. Wrongful act** means:

1.  With respect to Insuring Agreement **1.** Investment Adviser Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured adviser** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **investment advisory services**;

2.  With respect to Insuring Agreement **2.** Professional Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any:

    a.  **Accounting firm** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **accounting services**;

    b.  **Life and health insurance agency** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **life and health services**; or

    c.  **Professional service provider** or its **insured persons**, solely in their capacities as such, in rendering or failing to render **professional services**;

3.  With respect to:

    a.  Insuring Agreement **3.a.** and **3.b.** Directors And Officers Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by any **insured executive**, solely in his or her capacities as such, or any matter claimed against an **insured executive** solely by reason of their status as **insured executives**; and

    b.  Insuring Agreement **3.c.** Directors And Officers Liability Insurance, any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by an **insured entity**.

## SECTION III – EXCLUSIONS

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

**A.** Any:

1.  **Insured** gaining any profit, remuneration or pecuniary advantage to which they were not legally entitled, including but not limited to, any remuneration to an **insured** not properly approved by any shareholders; or

2.  Deliberately fraudulent, dishonest or criminal actions of an **insured**;

provided, however, that any of the above is established by admission of an **insured** in writing or a final, non-appealable adjudication in the underlying action.

For the purpose of determining the applicability of this exclusion, knowledge possessed by any **insured person** will not be imputed to any other **insured person**, but knowledge possessed by any past, present or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer, comptroller or general counsel (or equivalent position) of the Named Entity or an **insured entity** will be imputed to any **insured entity**.

**B.** Any **wrongful act** or any matter, fact, circumstance, situation, transaction, cause or event and **interrelated wrongful act** which has been the subject of any notice given under any prior policy of which this Policy is a renewal or replacement or which it may succeed in time.

**C.** Any demand, suit, proceeding, investigation or **claim** pending as of or made against any **insured** prior to the Pending And Prior Proceeding Date shown in the Declarations; or

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

Any **wrongful act** or matter, fact, circumstance, situation, transaction, cause or event and **interrelated wrongful act**, regardless of the legal theory upon which demand, suit, proceeding, investigation or **claim** made against any **insured** prior to the Pending And Prior Proceeding Date shown in the Declarations is predicated.

**D.** Any actual or alleged act or omission of **insured persons** serving as, or any **insured person's** status as, a director, officer, trustee, governor, manager, general counsel or risk manager of any organization other than an **insured entity** or individual or entity specifically listed on the Schedule Of Professional Service Providers endorsement to this Policy regardless of whether an **insured** directed or requested such an **insured person** to serve in such other position or capacity.

**E.** Any **claim** by, or on behalf of, or in the right of (whether such right is transferred or assigned by operation of law or otherwise) any **insured**; provided, however, this exclusion does not apply to any derivative action on behalf of the **insured entity** or any shareholder class action where such action is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **insured**.

**F.** Any:

**1.** Bodily injury, sickness, disease, or death of any person, including any emotional distress, mental anguish, outrage, or humiliation associated with such bodily injury, sickness, disease or death;

**2.** **Personal injury**, trespass, nuisance, assault, battery, or loss of consortium; or

**3.** Damage to or destruction of any tangible or intangible property including loss of use.

Paragraph **1.** of this exclusion does not apply to a **claim** for emotional distress or mental anguish arising solely from the rendering of or failure to render **accounting services**, **life and health services**, **professional services** and **investment advisory services**.

Paragraphs **1.**, **2.** and **3.** of this exclusion do not apply to any libel, slander, oral or written publication of defamatory or disparaging material committed by an **insured** in the performance of professional services otherwise covered by this Policy.

**G.** Any discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time, or any request, demand or order to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**, including but not limited to a **claim** alleging damage to the **insured entities**, their **security** holders, or their creditors.

However, this exclusion does not apply to **loss** that would otherwise be covered under Insuring Agreement **3.a.** Directors And Officers Liability Insurance for a **claim** brought derivatively on behalf of an **insured entity** by a **security** holder or member of an **insured entity**.

**H.** Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries under **ERISA**, its amendments or any similar provisions of state or foreign statutory or common law in connection with any pension, employee benefit or welfare plan or trust established or maintained for the purpose of providing benefits to the employees of an **insured entity** or the Named Entity.

**I.** Breach of contract; provided, however, this exclusion does not apply to any **claim** for rendering or failing to render **investment advisory services**, **accounting services**, **life and health services** or **professional services**.

**J.** Any:

**1.** Activities of any **insured** as an underwriter, **broker** or **dealer**, or mortgage **broker** (as those terms are defined in the Investment Company Act of 1940, the Securities Act of 1933, or the Securities Exchange Act of 1934, including their amendments) in **securities**;

**2.** Purchase or sale of **securities** or insurance products for which an **insured** received commission or other remuneration or where an **insured** had a 5% or more equity interest in the issuer of such **securities**; or

**3.** Investment banking, leveraged buyouts, going private transactions, fairness opinions, mergers, acquisitions, restructurings, divestitures, **securities** offerings, syndications, underwriting or similar activities.

**K.** The inability of any bank or banking firm, **broker** or **dealer** in **securities** or commodities, or any other person or entity, to make any payment by or to settle or effect any transaction of any kind.

**L.** **Unauthorized access** to the **insured's electronic communications system**.

**M.** Any obligations or duties imposed under a workers' compensation, disability benefits or unemployment compensation law or any similar law or regulation.

MAIC000023

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**N.** Any refusal or failure to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, sexual harassment, humiliation, discrimination, or other employment-related torts including, but not limited to, wrongful termination, failure or refusal to hire or promote, wrongful discipline; wrongful reference, deprivation of a career opportunity, demotion or adverse change in terms, conditions or status of employment; wrongful failure to grant tenure; humiliation; retaliation for asserting a legal right; workplace harassment including, without limitation offensive, intimidating, coercive or unwelcome conduct, advances, contact or communications, negligent hiring, retention, supervision, training or performance evaluation; and employment-related misrepresentation, defamation, or invasion of privacy or infliction of emotional distress.

**O.** Any **unintentional data compromise**.

**P.** Any services rendered during the period of any suspension or revocation of an **insured's** certification, licensure, accreditation, appointment or other right to practice **accounting services**, **investment advisory services**, **life and health services** or **professional services**.

**Q.** Activities as a partner, principal, officer, director, manager, member, employee, independent contractor or administrative staff of any organization or public office other than the Named Entity or an organization specifically endorsed by name onto this insurance.

**R.** Any **claim** involving the amount of, return of, disgorgement of or reimbursement of fees, commissions or other sums paid to an **insured** for **accounting services**, **investment advisory services**, **life and health services** or **professional services** rendered by an **insured**; provided, however, that this exclusion will not apply to **defense costs**.

**S.** Any funds transfer fraud:

    **1.** Arising out of **accounting services**, **investment advisory services**, **life and health services** or **professional services**; and

    **2.** Resulting directly from the **insured** having authorized or transferred, paid or delivered any funds, established any credit, debited any account or given any value on the faith of a **fraudulent transfer request**.

**T.** Any:

    **1.** Disallowed deduction(s), credit(s) or other item(s) on a tax return; or

    **2.** Taxes owed by a customer.

**U.** Any actual or alleged violation of the Fair Labor Standards Act (except the Equal Pay Act) or any other law concerning wage and hour practices, including but not limited to any law addressing off-the-clock work, providing rest or meal periods, reimbursement of expenses, classification of employees as exempt or non-exempt, timely payment of wages, conversions, unjust enrichment, or unfair business practices.

**V.** Any actual or alleged error, misstatement, misleading statement, negligent act or omission, or neglect or breach of duty by an **insured** in their capacities as such in connection with any actual or alleged violation of any law or public policy concerning discrimination or harassment against anyone who is not an **insured**.

## SECTION IV – LIMITS OF LIABILITY AND RETENTIONS

**A. Limits Of Liability**

    **1. Aggregate Limit Of Liability**

    The Aggregate Limit Of Liability shown in the Declarations is the Insurer's aggregate liability for all **loss**, in excess of the applicable Retention, under all Coverages combined for all **claims** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

    **2. Insuring Agreement Limit Of Liability**

    Subject to the Aggregate Limit Of Liability, the applicable Insuring Agreement Limit Of Liability shown in the Declarations is the Insurer's maximum liability for all **loss** under each insuring agreement, in excess of the applicable Retention, for each **claim** first made against the **insured** during the Policy Period and the Extended Reporting Period, if applicable, and reported in writing to the Insurer pursuant to Section **VI** – Notice.

    **3. Interrelated Wrongful Acts**

    All **claims** for the same **wrongful act** or **interrelated wrongful acts** will be considered a single **claim** and will be deemed to have been made when the earliest **claim** was first made, or when the earliest **claim** is treated as

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

having been made in accordance with Section **VI** – Notice, whichever is earliest, whether before or during the Policy Period.

**Defense costs** are part of, not in addition to, the applicable Limit Of Liability. Such **defense costs** will reduce the applicable Limit Of Liability and will be applied against the Retention. The Insurer will have no obligation to pay any **loss** or to defend or continue to defend any **claim** or to pay **defense costs** after the applicable Limits Of Liability have been exhausted by payment of **loss** or **defense costs**.

### B. Retention

1. The Insurer will pay only that portion of any **loss** which is in excess of the applicable Retention for each Insuring Agreement shown in the Declarations, up to the applicable Limit Of Liability shown in the Declarations. A Retention will apply to each and every **claim**, and such Retention will be borne by the **insureds** uninsured and at their own risk.

2. No Retention will apply to **loss** incurred by an **insured executive** if such **loss** cannot be indemnified by the Named Entity or **insured entity** because the Named Entity or **insured entity** is not permitted or required to indemnify, or is not financially able to indemnify by reason of **financial impairment**. The Insurer's liability for all other covered **loss** will apply only to that part of **loss** on account of each **claim** which is excess of the applicable Retention shown in the Declarations.

3. If different parts of a single **claim** are subject to different Retentions, the applicable Retention will be applied separately to each part of the **claim**. The sum of the Retentions will not exceed the largest applicable Retention.

### SECTION V – INDEMNIFICATION

**A.** If the **insured entity**:

1. Is permitted or required by law to indemnify the **insured persons** for **loss** or to advance **defense costs** on their behalf; and

2. Fails or refuses to do so other than for reason of **financial impairment**;

then, any payment by the Insurer of such **loss** or **defense costs** will be subject to the single highest applicable Retention shown in the Declarations.

**B.** The **insured entity** will be deemed to provide indemnification to the **insured persons** for such **loss** or advancement of such **defense costs** to the fullest extent permitted or required by law and hereby agrees to indemnify the **insured persons** for such **loss** or to advance such **defense costs** to the fullest extent permitted or required by law, including the making in good faith of any required application for court approval for such payment.

**C.** If the **insured entity** is unable to fully indemnify the **insured persons** for **loss** or to advance **defense costs** for reasons of **financial impairment**, the **insured entity** will be deemed to provide indemnification for such **loss** or advancement of such **defense costs** to the fullest extent permitted or required by law, including the making in good faith of any required application for court approval for such payment, and the Insurer will pay such **loss** or advance such **defense costs** regardless of whether some or all of the Retention is unpaid; provided, however, that the Insurer will only be required to make such payments if the appropriate court approval has been obtained, including but not limited to, any "comfort order" in the event of bankruptcy or insolvency. The **insureds** will cooperate fully with the Insurer in making any application for court approval that may be necessary or filing appropriate motions for a "comfort order" in the event of **financial impairment**.

### SECTION VI – NOTICE

**A.** The Named Entity will, as a condition precedent to the obligations of the Insurer under this Policy, give written notice to the Insurer of a **claim** made against an **insured** as soon as practicable after the Named Entity's risk manager, or general counsel or functional equivalent first becomes aware of the **claim**, but in all events no later than either:

1. The end of the Policy Period or the Extended Reporting Period, if applicable; or

2. Within 60 days after the end of the Policy Period or the Extended Reporting Period, if applicable, as long as such **claim** was first made against an **insured** within the final 60 days of the Policy Period or the Extended Reporting Period, if applicable.

**B.** If, during the Policy Period, an **insured** becomes aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** and gives written notice to the Insurer of the circumstances, the anticipated allegations of the **wrongful act** and the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** subsequently made against the **insured** and reported to the

Insurer for any **wrongful act** or **interrelated wrongful acts** will be deemed to have been made at the time such notice was received by the Insurer under this provision.

**C.** All notices under this Policy will be provided to the Insurer shown in the Declarations and will refer to the Policy Number. The notices will be in writing and sent by mail, electronic mail, prepaid express courier or facsimile to the address shown in the Policyholder Notice.

**D.** Notice will be effective on the date of receipt by the Insurer.

## SECTION VII – DEFENSE COSTS, SETTLEMENT AND COOPERATION

**A.** The Insurer will have the right and duty to defend the **insured** and investigate any **claim** as a result of a **wrongful act** brought against the **insured** and to which this insurance applies, even if such **claim** is groundless, false or fraudulent, pursuant to the following provisions:

    **1.** The Insurer will select defense counsel; provided, however, that if the law of the state of the Named Entity's domicile, shown in the Declarations, allows the **insured** to control the selection of defense counsel where a conflict of interest has arisen between the **insured** and the Insurer, the Insurer will provide a list of attorneys or law firms from which the **insured** may designate defense counsel who will act solely in the **insured's** interest, and the **insured** will direct such defense counsel to cooperate with the Insurer. Such cooperation will include:

        **a.** Providing to the Insurer on a regular basis, but not less frequently than every 3 months, written reports on claimed **loss**, damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **claim**;

        **b.** Providing any other reasonable information requested;

        **c.** Fully itemized billing on a periodic basis; and

        **d.** Cooperating with the **insured** and Insurer in resolving any discrepancies.

    **2.** The Insurer will not settle any **claim** without the **insured's** prior written consent, but the Insurer will have at all times the right to recommend a settlement of any **claim**.

    **3.** The **insured** will not, with respect to any **claim** covered under this insurance, except at the **insured's** own cost, make payment, admit any liability, settle any **claim**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur any **defense costs** without the Insurer's prior written consent, such consent not to be unreasonably withheld. The **insured** must take all reasonable action within the **insured's** ability to prevent or mitigate any **loss** or **claims**. Any costs and expenses incurred by the **insured** prior to giving written notice of the **claim** to the Insurer will be borne by the **insured** and will not constitute satisfaction of the Retention.

    **4.** The **insured** will cooperate with the Insurer and do whatever is necessary to pursue any right of indemnity, contribution or apportionment which the **insured** may have. Upon the Insurer's request, the **insured** will:

        **a.** Submit to examination and interview by an Insurer's representative, under oath if required;

        **b.** Attend hearings, depositions, and trials;

        **c.** Assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the defense of **claims**;

        **d.** Give a written statement or statements to the Insurer's representative(s) and meet with such representative(s) without cost to the Insurer for the purpose of determining whether there is coverage under this Policy; and

        **e.** Assist in any obligation the Insurer may have to investigate or defend a **claim**.

**B.** No coverage is provided for **claims** against the Named Entity or an **insured entity** in any respect under Insuring Agreement **3.** Directors And Officers Liability Insurance except:

    **1.** To the extent of indemnification of **insured executives** by the Named Entity or **insured entity** under Insuring Agreement **3.b.** Directors And Officers Liability Insurance; or

    **2.** If Insuring Agreement **3.c.** Directors And Officers Liability Insurance is purchased.

## SECTION VIII – EXTENDED REPORTING PERIOD

**A.** If the Insurer refuses to renew this Policy or the Named Entity cancels or refuses to renew this Policy, the Named Entity has the right, to one or more Extended Reporting Periods, as described below, in which to give to the Insurer

MAIC000026

FILED DATE: 10/16/2024 12:35 PM    2024CH09499

written notice of **claims** first made against the **insureds** during the Extended Reporting Period for any **wrongful act** or **interrelated wrongful acts** occurring during the Policy Period and otherwise covered by this Policy.

The right to an Extended Reporting Period does not apply to any cancellation or nonrenewal resulting from non-payment of premium, or as a result of a change in policy terms, conditions, exclusions or premiums.

An Extended Reporting Period does not extend the Policy Period or change the scope of coverage provided.

**B.** The limits of liability applicable to **claims** first made during the Extended Reporting Period are a part of, and not in addition to, the limits of liability for the Policy Period. The Extended Reporting Period will not increase or reinstate this Policy's limits of liability, which is the maximum liability of the Insurer for the Policy Period and Extended Reporting Period combined.

**C.** A Basic Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the Policy Period and lasts for 60 days.

**D.** A Supplemental Extended Reporting Period is available for the Additional Period shown in the Declarations, but only upon payment of the Extended Reporting Period Premium shown in the Declarations. This Supplemental Extended Reporting Period starts when the Basic Extended Reporting Period, set forth in Paragraph **C.** above, ends.

There will be no right to a Supplemental Extended Reporting Period unless a written request for this extension, together with the additional premium, is received by the Insurer within 30 days of the effective date of cancellation or nonrenewal.

The additional premium for the Supplemental Extended Reporting Period will be fully earned at the inception of the Supplemental Extended Reporting Period. Once in effect, the Supplemental Extended Reporting Period cannot be cancelled.

## SECTION IX – CANCELLATION

**A.** The first Named Entity may cancel this Policy by surrender thereof to the Insurer or any of its authorized representatives or by mailing or delivering to the Insurer written notice stating when thereafter the cancellation will be effective.

**B.** The Insurer may cancel this Policy for non-payment of premium by mailing or delivering to the first Named Entity written notice of cancellation, at the address shown in the Declarations, at least 10 days before the effective date of cancellation.

**C.** Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

**D.** If the first Named Entity cancels the Policy, the Insurer will send the first Named Entity any premium refund due which will be computed at customary short rates. Premium adjustment may be made at the time cancellation is effected and, if not then made, will be made as soon as practicable after cancellation becomes effective. Mailing of the Insurer's check or the check of its representative will be sufficient tender of any refund of premium due to the first Named Entity.

## SECTION X – CHANGE IN CONTROL

**A. Change In Control Of The Named Entity**

Immediately upon the occurrence of any of the following:

**1.** The Named Entity consolidates with or merges into, or sells all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

**2.** Any person or entity or group of persons or entities acting in concert acquires an amount of the outstanding **securities** representing more than 50% of the voting power for the election of directors of the Named Entity, or acquires the voting rights of such an amount of such **securities**; or

**3.** The appointment of a receiver, conservator, trustee, liquidator or rehabilitator or any similar official for or with respect to the Named Entity;

(any of the above events are herein referred to as the Transaction)

then, this Policy will continue in full force and effect as to **wrongful acts** occurring prior to the effective date of the Transaction, but there will be no coverage afforded by any provision of this Policy for any actual or alleged **wrongful act** occurring after the effective date of the Transaction.

MAIC000027

The Named Entity will give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

However, if the **insured adviser(s)** acquires another entity by merger or consolidation such that:

a. The **insured adviser(s)** is the surviving entity;

b. The regulatory assets under management of the combined entity is less than 125% of the regulatory assets under management of the **insured adviser(s)** prior to the effective date of the Transaction; and

c. There will not be a change in 50% or more of the **insured executives**;

then coverage will continue until the end of the Policy Period and written notice of the Transaction to the Insurer is not required.

**B.  Termination Of Coverage After Certain Transactions**

If, during the Policy Period, there will be a change in the majority of the **insured executives** of any **insured adviser**, or if any **insured adviser** will be merged, consolidated or otherwise combined with any other entity, then coverage (including, but not limited to, Section **VIII** – Extended Reporting Period), for any and all **insureds**, with respect to such investment adviser and all of its activities, will not apply to any **wrongful act** occurring subsequent to such change of control.

## SECTION XI – SUBROGATION

In case of payment of **loss** by the Insurer, the Insurer will be subrogated to the amount of such payment to the **insured's** right of recovery against any other person or organization for such **loss**, and the **insured** will execute all papers required, and will do everything that may be necessary to secure and preserve such rights, including the execution of documents that enable the Insurer effectively to bring suit in the name of the **insured**. In no event, however, will the Insurer exercise its rights of subrogation against an **insured** under this Policy unless such **insured** has committed a deliberate criminal act, or deliberate fraudulent act, or obtained any profit or advantage to which such **insured** was not legally entitled, and as to any of the foregoing, only as evidenced by a written statement or written admission by any **insured** or a judgment or other final adjudication in the underlying action or in a separate action, alternative dispute resolution process (including one pursuant to Section **XII** – Other Insurance) or other proceeding.

Any recovery, after expenses, will be used to reduce the **loss**, and so much of such recovery will be paid to the Insurer as will reduce the **loss** ultimately borne by the Insurer to what it would have been had the recovery preceded any payment of such **loss** by the Insurer.

## SECTION XII – OTHER INSURANCE

This Policy will apply only as excess over any other valid and collectible insurance, whether primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit Of Liability provided by this Policy. This Policy will also be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **claim** for which this Policy may be obligated to pay **loss**.

## SECTION XIII – ARBITRATION

Only if requested by the **insured**, the Insurer will submit any dispute, controversy or **claim** arising out of or relating to this Policy or the breach, termination or invalidity thereof to final and binding arbitration pursuant to such rules and procedures as the parties may agree. If the parties cannot so agree, the arbitration will be administered by the American Arbitration Association in accordance with its then prevailing commercial arbitration rules. The arbitration panel will consist of one arbitrator selected by the **insured**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

## SECTION XIV – AUTHORITY

It is agreed that the first Named Entity will act on behalf of its subsidiaries and all **insured entities** and **insured persons** with respect to giving notice of **claim**, giving and receiving notice of cancellation or nonrenewal, the payment of premiums that may become due under this Policy, the payment of the Retention, and the receiving of any return premiums that may become due under this Policy, the receipt and acceptance of any endorsements issued to form a part of this Policy and the exercising or declining to exercise any right to an Extended Reporting Period.

## SECTION XV – ASSIGNMENT

No assignment of interest under this Policy will be valid without the prior written consent of the Insurer.

## SECTION XVI – ACTION AGAINST THE INSURER

MAIC000028

No action will lie against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy, and the amount of the **insured's** obligation to pay has been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement will thereafter be entitled to recover under this Policy to the extent of any insurance afforded by this Policy. No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **insured** to determine the **insured's** liability, nor will the Insurer be impleaded by the **insured** or the **insured's** legal representative.

## SECTION XVII – REPRESENTATIONS

By acceptance of this Policy, the Named Entity agrees that the statements in the **application** are its agreements and representations and that this Policy is issued in reliance upon the truth and accuracy of such agreements and representations, which are deemed material to the acceptance of the risk or the hazard assumed by the Insurer under the Policy.

## SECTION XVIII – ENTIRE AGREEMENT

This Policy, together with the Declarations, **application** and endorsements, embodies all agreements existing between the Named Entity and the Insurer or any of their agents relating to this insurance. The headings or captions used in this Policy are for the purposes of reference only and will not otherwise affect the meaning of this Policy.

## SECTION XIX – TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US

If this Coverage Form and any other Coverage Form or policy issued to the Named Entity by the Insurer or any company affiliated with the Insurer applies to the same **loss**, the aggregate maximum Limit of Liability under all of the Coverage Forms or policies will not exceed the highest applicable Limit of Liability under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by the Insurer or an affiliated company specifically to apply as excess insurance over this Coverage Form.

MAIC000029

PROFESSIONAL LIABILITY

**MARKEL**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**A.** This Policy includes coverage for any **claim** for **wrongful acts** resulting from any **certified act of terrorism**.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the Insurer has met the Insurer's deductible under the Terrorism Risk Insurance Act, the Insurer will not be liable for the payment of any portion of the amount of such **losses** that exceeds $100 billion, and in such case insured **losses** up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.** With respect to coverage provided by this endorsement, the following is added to Section **II – Definitions**:

**Certified acts of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The following criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any **loss** which would otherwise be excluded under this Policy.

All other terms and conditions remain unchanged.

MPL 1216 07 17                                                                                                     Page 1 of 1

MAIC000030



FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LIFE PRODUCT SALES COVERAGE – NAMED INDIVIDUALS

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY COVERAGE FORM

### SCHEDULE

| Named Individuals | Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent | Pending And Prior Proceeding Date For Registered Investment Adviser Services | Termination Date |
|---|---|---|---|
| Sanford Schmidt | 03/01/1985 | 12/02/1993 | |
| Ethan Michael Schmidt | 08/30/2019 | 08/22/2019 | |
| | | | |
| | | | |

**A.** Each of the Named Individuals shown in the Schedule of this endorsement is a covered **insured** and subject to the exclusion in Paragraph **B.** of this endorsement.

**B.** Section **III** – Exclusions is amended by the following:

    **1.** The following exclusion is added:

        This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

        The purchase or sale of **securities** or investments as a **registered representative** or insurance products as a **life insurance agent**; however, this exclusion will not apply to the Named Individuals shown in the Schedule of this endorsement, solely with respect to **wrongful acts** in the rendering of or failure to render **professional services**:

        **1.** Directly involved in the purchase or sale of insurance products as a **life insurance agent**, provided a Pending And Prior Proceeding Date For Purchase Or Sale Of Insurance As A Life Insurance Agent is shown in the Schedule of this endorsement; or

        **2.** As a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity and provided a Pending And Prior Proceeding Date For Registered Investment Adviser Services is shown in the Schedule of this endorsement;

        and occurring on or after the applicable Pending And Prior Proceeding Date and prior to the applicable Termination Date, if any, shown in the Schedule of this endorsement.

    **2.** With respect to coverage provided by this endorsement, exclusion **J.2.** does not apply.

MPL 1224 07 17

Page 1 of 2

MAIC000031

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**C.** Solely with respect to **wrongful acts** in the rendering of or failure to render **professional services** by the Named Individuals included in Paragraph **A.** above, the Pending And Prior Proceeding Date shown in the Declarations is amended to be the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement.

However, if the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for any Named Individual precedes the Pending And Prior Proceeding Date shown in the Declarations, in the event of a **claim** alleging a **wrongful act**:

1. Arising from the rendering of or failure to render **professional services** by the Named Individual directly involved in the purchase or sale of insurance products as a **life insurance agent**, or as a **registered investment adviser** only when rendered on behalf of or under contract with the Named Entity; or

2. By such Named Individual; and

3. Occurring on or after the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for such **professional services** and prior to the Pending And Prior Proceeding Date shown in the Declarations;

then the Pending And Prior Proceeding Date shown in the Declarations and applicable to the Named Entity will be equal to the applicable Pending And Prior Proceeding Date shown in the Schedule of this endorsement for such Named Individual for such **professional services**.

**D.** This endorsement will not increase the Limits Of Liability shown in the Declarations.

All other terms and conditions remain unchanged.

FILED DATE: 10/16/2024 12:35 PM   2024CH09499



**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF LIFE AND HEALTH INSURANCE AGENCIES

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

### SCHEDULE

| Entity |
| --- |
| Schmidt Financial Group, LLC |
|  |

Each Entity shown in the Schedule of this endorsement is a covered **life and health insurance agency**.

All other terms and conditions remain unchanged.

MPL 1230 07 17                                                                                                   **Page 1 of 1**

MAIC000033

FILED DATE: 10/16/2024 12:35 PM    2024CH09499



**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SUPPLEMENTAL COVERAGE EXTENSION

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**SCHEDULE**

| Coverage | Limits Of Liability |
|---|---|
| Emergency Real Estate Consulting Fees: | $ 25,000 |
| Key Individual Replacement Expenses: | $ 25,000 |
| Kidnap Expenses: | $ 25,000 |
| Workplace Violence Counseling: | $ 25,000 |

With respect to coverages provided by this endorsement, the following changes apply.

A.  The following are added to Section I – Coverage:

**Emergency Real Estate Consulting Fees**

The Insurer will reimburse the Named Entity any reasonable realtor's fees, commissions, or real estate consultant's fee necessitated by the Named Entity's need to relocate due to the **unforeseeable destruction** of the Named Entity's principal location listed in the Declarations during the Policy Period. The Emergency Real Estate Consulting Fee limit shown in the Schedule of this endorsement is the most the Insurer will reimburse per Policy Period for all Named Entities combined.

**Key Individual Replacement Expenses**

The Insurer will reimburse the Named Entity for reasonable **key individual replacement expenses** if a **professional employee** suffers an **injury** during the Policy Period which results in the loss of their life during the Policy Period. The Key Individual Replacement Expenses limit shown in the Schedule of this endorsement is the most the Insurer will pay for all **key individual replacement expenses** in any one Policy Period.

**Kidnap Expenses**

The Insurer will pay on behalf of the Named Entity or **professional employee**, reasonable fees incurred as a result of any **professional employee's** kidnapping, or the kidnapping of the **professional employee's spouse**, parent or child during the Policy Period. The Kidnap Expenses limit shown in the Schedule of this endorsement is the most the Insurer will pay for all reasonable fees in any one Policy Period. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

a.  Fees and expenses of an independent negotiator or consultant retained with the Insurer's prior approval;

b.  Interest on any loan taken by the Named Entity or **professional employee** to pay damages covered under this policy; provided, however, we shall not be liable for any interest accruing prior to 30 days preceding the date of

MPL 1232 07 17

Page 1 of 3

MAIC000034

such payment nor subsequent to the date of reimbursement from the Insurer for any portion of damages recoverable under this policy;

**c.** Costs of travel and accommodations incurred by the Named Entity or **professional employee** which become necessary due to the applicable kidnapping;

**d.** The reward paid by the Named Entity or **professional employee** which is pre-approved by the Insurer, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this policy; and

**e.** Current salary to the **professional employee** who is kidnapped; provided, however, that such person is held for more than 30 days. Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of:

**(1)** The release of the kidnapped person or discovery of their death;

**(2)** 120 days after the Insurer receives the last credible evidence that the kidnapped person is still alive;

**(3)** 12 months after the date of kidnapping; or

**(4)** Exhaustion of the Kidnap Expenses limit.

**Workplace Violence Counseling**

In the event that an incidence of **workplace violence** occurs at any of the Named Entity's premises during the Policy Period, the Insurer will reimburse the Named Entity for reasonable expenses incurred for the emotional counseling of the Named Entity's **employees** during the Policy Period. The Workplace Violence Counseling limit shown in the Schedule of this endorsement is the most the Insurer will reimburse per Policy Period for all **employees** combined.

**B.** The following are added to Section **II** – Definitions:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**Employee(s)** includes leased workers and independent contractors; provided, however, the independent contractor is specifically endorsed by name to this Policy. **Employee** does not include temporary workers.

**Injury** means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

**Key individual replacement expenses** means the following necessary expenses:

**1.** Costs of advertising the employment position opening;

**2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

**3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contract.

**Professional employee** means a member of the Named Entity's staff, but solely while providing **accounting services**, **investment advisory services**, **life and health services**, or **professional services** on behalf of the Named Entity; however, **professional employee** does not include administrative, secretarial, or other clerical support staff, or temporary or leased workers. **Professional employee** does not include independent contractors unless specifically endorsed by name to this Policy.

**Unforeseeable destruction** means damage resulting from a **certified act of terrorism**, fire, crash or collapse which renders all of the Named Entity's primary office completely unusable.

**Workplace violence** means any intentional use or threat of deadly force by any natural person with intent to cause harm and results in **injury**, or death of a natural person while on the Named Entity's premises.

MPL 1232 07 17            **Page 2 of 3**

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**C.** Section **IV** – Limits Of Liability And Retentions is amended by the following:

1. The following is added to Paragraph **A.** Limits Of Liability:

   The Limits Of Liability shown in the Schedule of this endorsement are in addition to, not part of, the Aggregate Limit Of Liability shown in the Declarations.

   Coverages provided by this endorsement are not considered **defense costs**.

2. The following is added to Paragraph **B.** Retention:

   The Retention does not apply to any coverage provided by this endorsement.

All other terms and conditions remain unchanged.

MPL 1232 07 17                                                                                                  **Page 3 of 3**

MAIC000036

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – COVERAGE TERRITORY

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following condition is added:

**COVERAGE TERRITORY**

This insurance applies worldwide, provided the **claim** is made in the United States of America, its territories and possessions, Puerto Rico or Canada.

All other terms and conditions remain unchanged.

**MPL 1255 05 19**                                                                                  **Page 1 of 1**

MAIC000037

FILED DATE: 10/16/2024 12:35 PM   2024CH09499



**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – PRIOR KNOWLEDGE

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**SCHEDULE**

| Insuring Agreement(s) | Date |
|---|---|
| Investment Adviser Professional Liability | 12/31/2020 |
| Professional Liability | 12/31/2020 |
| | |
| | |
| | |
| | |
| | |

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **wrongful act** or **interrelated wrongful acts** related to the Insuring Agreement(s) shown in the Schedule of this endorsement and occurring prior to the applicable Date shown in the Schedule of this endorsement which any **insured** knew or could reasonably have foreseen that such **wrongful act** or **interrelated wrongful acts** could lead to a **claim** under this Policy.

For the purpose of this exclusion, all actual or alleged **interrelated wrongful acts** will be deemed to have taken place on the date on which the earliest of such actual or alleged **wrongful acts** took place.

All other terms and conditions remain unchanged.

**MPL 1313 05 19**                                                                                     **Page 1 of 1**

MAIC000038

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – REIMBURSEMENT OF FEES

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any **claim** Involving the amount, return, disgorgement or reimbursement of fees, commissions or other sums paid to an **insured** for **professional services** rendered by an **insured**.

All other terms and conditions remain unchanged.

MPL 1315 07 17                                                                                          **Page 1 of 1**

MAIC000039

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**



# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – WARRANTY OR GUARANTEE OF FUTURE ASSETS

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

The warranty or guarantee of future values, assets, earnings or a specified rate of return or interest.

All other terms and conditions remain unchanged.

MPL 1320 07 17          **Page 1 of 1**

MAIC000040

FILED DATE: 10/16/2024 12:35 PM   2024CH09499



**PROFESSIONAL LIABILITY**
POLICY NUMBER: PL86085C

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIED PERSON, ORGANIZATION, INVESTMENT VEHICLE, SERVICE OR ACTIVITY

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**SCHEDULE**

| Specified Person(s), Organization(s), Investment Vehicle(s), Service(s) Or Activity(ies) |
|---|
| See attached schedule |
| |
| |
| |
| |

The following is added to Section **III** – Exclusions:

This Policy provides no coverage for any **loss** in connection with any **claim** alleging, arising out of, based upon, or attributable to:

Any of the Specified Person(s), Organization(s), Investment Vehicle(s), Services(s) Or Activity(ies) described in the Schedule of this endorsement, including the purchase, sale, servicing or management of, advice relative to, or recommendation to purchase, sell, or hold any investment interest in the described Investment Vehicle(s), Services(s) or Activity(ies).

All other terms and conditions remain unchanged.

MPL 1323 05 19

Page 1 of 2

MAIC000041

# SCHEDULE

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

---

**EXCLUSION - SPECIFIED PERSON, ORGANIZATION, SERVICE OR ACTIVITY**

Based upon arising from or in consequence of the Catalyst Wealth Management Media Fund I, LLC

TLG Advisors, Inc.

Cryptocurrency including, but not limited to, Bitcoin, Litecoin, Ethereum,
Ripple, Dash, Zcash, Monero or Non-Fungible tokens (NFT).

However, this exclusion shall not apply to mutual funds, publicly traded real estate
investment trusts, publicly traded master limited partnerships, publicly traded limited
partnerships, non-leveraged exchange traded products, non-inverse exchange
traded products, agency backed securities or FDIC insured structured CD products.

Non-traditional life insurance products.

---

MAIC000042

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

**PROFESSIONAL LIABILITY**

**MARKEL**

# ARKEL AMERICAN INSURANCE COMPAN

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS AMENDATORY

This endorsement modifies insurance provided under the following:

INVESTMENT ADVISER, PROFESSIONAL SERVICES AND DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

**A.** Section **II** – Definitions is amended as follows:

    **1.** Definition **Z. Loss** is replaced by the following:

        **Z.** **Loss** means the amount that an **insured** becomes legally obligated to pay on account of any **claim**, including but not limited to, damages, judgments, settlements and **defense costs**.

        **Loss** does not include:

            **1.** Payments for pre-judgment and post-judgment interest as described in Paragraph **C.** below in the amendment to Section **IV** – Limits Of Liability And Retentions;

            **2.** Any costs incurred by an **insured** to comply with any order for injunctive or other non-monetary relief, any agreement to provide such relief or any regulatory or administrative directive;

            **3.** Taxes imposed on an **insured**, fines or penalties;

            **4.** Any amount not insurable under the law pursuant to which this Policy is construed;

            **5.** Regular or overtime wages, salaries, commissions, or fees of **insured persons**;

            **6.** Any fees, charges, commissions or other compensation paid to an **insured**, including allegedly excessive or improper fees; or

            **7.** Punitive, exemplary or multiplied damages, except that if a suit is brought against the **insured** with respect to a **claim** for acts or alleged acts falling within coverage hereof, seeking both compensatory and punitive or exemplary damages, then the Insurer will afford a defense to such action without liability for such punitive or exemplary damages.

    **2.** Definition **CC. Pollutants** is replaced by the following:

        **CC. Pollutants** means, but is not limited to, any solid, liquid, gaseous, or thermal irritant or contaminant, including without limitation, smoke, vapor, soot, fumes, acids, alkalies, chemicals, mold, fungi odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, and waste.

**B.** The following is added to Exclusion **G.** under Section **III** – Exclusions:

    However, this exclusion does not apply to damage caused by heat, smoke or fumes from a hostile fire.

    As used in this exclusion, hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**C.** The following is added to Paragraph **1.** Aggregate Limit Of Liability of **A.** Limits Of Liability under Section **IV** – Limits Of Liability And Retention:

    If the claimant or the claimant's attorney makes a settlement offer resolving the **claim** against the **insured** and the Insurer (the principal amount of which is within the applicable policy limits), and the **insured** and the claimant or the

**MPL 1484-IL 05 19**                                                                                                       **Page 1 of 2**

MAIC000043

FILED DATE: 10/16/2024 12:35 PM   2024CH09499

claimant's attorney agree to their portion of such settlement offer, but the Insurer unreasonably withholds its consent to such settlement and rejects its portion of the settlement offer, then, in the event a judgment is entered against the **insured** (the principal amount of which is within the applicable policy limits), the Insurer will be liable for all interest due on said judgment entered against the **insured**, even if the payment of the judgment, plus such interest thereon, totals a sum in excess of the policy's Limit Of Liability. If the **insured** rejects a settlement offer made by a claimant or the claimant's attorney, and the Insurer consented to the settlement, then the Insurer shall not be liable for any interest due on any subsequent judgment.

**D.** Paragraph **A.** under Section **VIII** – Extended Reporting Period is replaced by the following:

**A.** If the Insurer refuses to renew this Policy or the Named Entity cancels or refuses to renew this Policy, the Named Entity has the right, to one or more Extended Reporting Periods, as described below, in which to give to the Insurer written notice of **claims** first made against the **insureds** during the Extended Reporting Period for any **wrongful act** or **interrelated wrongful acts** occurring during the Policy Period and otherwise covered by this Policy.

An Extended Reporting Period does not extend the Policy Period or change the scope of coverage provided.

**E.** Section **IX** – Cancellation is amended as follows:

1. Paragraphs **A.** and **B.** are replaced by the following:

   **A.** The first Named Entity may cancel this Policy by surrender thereof to the Insurer or any of its authorized representatives or by mailing to the Insurer written notice stating when thereafter the cancellation will be effective.

   **B.** The Insurer may cancel this Policy for non-payment of premium. In such event, the Insurer shall mail written notice of cancellation to the first Named Entity, at the address last known to the Insurer, at least 10 days before the effective date of cancellation. Notification of cancellation will also be sent to the first Named Entity's broker, if known, or agent of record, if known. Proof of mailing will be sufficient proof of notice.

**2.** The following is added:

**Nonrenewal**

The Insurer may nonrenew this Policy by mailing written notice to the first Named Entity, at the address last known to the Insurer, stating the reason for nonrenewal and when, not less than 60 days thereafter, such nonrenewal will be effective. Notification of nonrenewal will also be sent to the first Named Entity's broker, if known, or agent of record, if known. Proof of mailing will be sufficient proof of notice.

**F.** Section **XII** – Other Insurance is replaced by the following:

When this insurance and any other coverage apply on the same basis to a **claim** for **loss** insured under the Policy, whether other insurance is provided on a primary, contributory, excess, contingent or otherwise, the Insurer is not liable for more than the proportion the applicable Aggregate Limit Of Liability provided by this Policy bears to all other valid and collectible insurance available to the **insured** or Named Entity for such **loss**. This Policy will also be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **claim** for which this Policy may be obligated to pay **loss**.

**G.** The following Section is added:

**BANKRUPTCY**

Bankruptcy or insolvency of any **insured** shall not relieve the Insurer of any of its obligations under this Policy.

All other terms and conditions remain unchanged.

MAIC000044



FILED DATE: 10/16/2024 12:35 PM   2024CH09499

# MARKEL AMERICAN INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

MIL 1214 09 17                                                                                                          Page 1 of 1

MAIC000045

2

**<u>CERTIFICATE OF SERVICE</u>**

I, David A. Eisenberg, an attorney, hereby certify that on October 19, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing and via U.S. mail to:

/s/ *David A. Eisenberg*

2